1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FILED ____ LODGED
____ RECEIVED ____ COPY

OCT 28 2002

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

Forest Guardians,

        Plaintiff,

v.

Ann M.. Veneman, Secretary of Agriculture; United States Forest Service,

        Defendant,

)
)
)
)
)
)
)
)
)
)
)
)

CV 01-138 TUC DCB

# O R D E R

     Plaintiff alleges that the Defendant has violated § 7 consultation provisions of the Endangered Species Act (ESA) by failing to observe required protections in carrying out its program for livestock grazing in eleven natural forests in New Mexico and Arizona. Plaintiff asks the Court to order the Defendant, the United States Forest Service (the Forest Service) to enter into formal consultation with the United States Fish and Wildlife Service (the FWS) regarding the impact of grazing permits on threatened or endangered species, or species proposed for listing as threatened or endangered. Defendant has raised numerous defenses, which are unsupported by the law and the administrative record in this case. Plaintiff is not, however, entitled to the relief requested based on its legal assertions and evidentiary record presented to this Court for purposes of the crossmotions now before the Court. Additional briefing is required, pursuant to the directives of the Court as set out in this Order.

### *The Endangered Species Act (ESA)*

     ESA is the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Authority v. Hill (TVA)*, 437 U.S. 153, 180



(1978). "Congress intended endangered species to be afforded the highest of priorities [in order to] halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184.

ESA creates a system for listing species as threatened or endangered and guarantees several substantive and procedural duties to protect species once they are listed. 16 U.S.C. § 1533. The ESA's major substantive protections are provided in two sections: 1) § 7 prohibits federal agencies from jeopardizing the continued existence of listed species, and 2) § 9 prohibits any "person . . . including federal agencies, state agencies, and private parties . . . from "taking" individual members of listed species. 16 U.S.C. § 1536(a)(2); 16 U.S.C. § 1538(a)(1)(B); 16 U.S.C. § 1532(13).

Section 7 of the ESA requires every federal agency, in consultation with the Secretaries of the Interior and Commerce,[1] to "insure that any action authorized, funded, or carried out by such agency (hereinafter, in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . .." 16 U.S.C. § 1536(a)(2). An agency action "jeopardizes the continued existence" of a threatened or endangered species when it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers or distribution of that species." 50 C.F.R. § 402.02. The proscription extends to "all activities or programs of any kind," and includes "actions directly or indirectly causing modifications to the land, water or air." 50 C.F.R. § 402.02. ESA obligations apply "to all actions in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03.

Responsibility for the substantive determination of whether an agency action is likely or not to jeopardize the existence of a species is on the agency, in this case the Forest Service. *Sierra Club v. Froehlke*, 534 F.2d 1289, 1303 (8th Cir. 1976); *Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir. 1985). The Fish and Wildlife Service (the FWS) is responsible for the

---

[1]Fish and Wildlife (the FWS) and National Oceanic and Atmospheric Administration.

procedural aspects of the consultation process. *Tennessee Valley Authority (TVA)*, 98 S. Ct. at 2295. The procedural requirements must be strictly adhered to because they are designed to insure agency compliance with the substantive provisions of § 7. *Florida Key Deer v. Stickney*, 864 F. Supp. 1222, 1227 (S.D. Fla. 1994) (citing *Thomas*, 753 F.2d 754).

The agency proposing to act must inquire whether any endangered or threatened species "may be present" in the area of the action. When there exists a chance that such species may be present, the agency must determine whether or not the action "may affect" the species. See 16 U.S.C. § 1536(c)(1) (agency must conduct a Biological Assessment before construction is begun); 50 C.F.R. 402.14 (if the proposed agency action is not a "major construction activity," the Biological Assessment is not required and the agency may make an independent evaluation of whether the action may affect a listed species).

This step serves as a screening function to determine whether successive steps are required. *Thomas*, 753 F.2d at 763. The standard for triggering consultation is "very low . . . any possible effect ." *Florida Key Deer*, 864 F. Supp. at 1228-1229; *Romero-Barcelo v. Brown*, 643 F.2d 835 (1st Cir. 1981), *rev'd on other grounds Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982). Only a finding of "no affect" terminates the agency's inquiry.

If the answer is affirmative, the agency is required to enter into formal consultation with the FWS. 50 C.F.R. § 402.14. The regulations provide as follows:

> (a) Requirement for formal consultation. Each Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat. If such a determination is made, formal consultation is required, except as noted in paragraph (b) of this section. The Director may request a Federal agency to enter into consultation if he identifies any action of that agency that may affect listed species or critical habitat and for which there has been no consultation. When such a request is made, the Director shall forward to the Federal agency a written explanation of the basis for the request.

> (b) Exceptions. (1) A Federal agency need not initiate formal consultation if, as a result of the preparation of a biological assessment under § 402.12 or as a result of informal consultation with the Service under § 402.13, the Federal agency determines,

> with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat.

50 C.F.R. § 402.14 (1995).[2]

In other words, "If the agency determines its proposed action "may affect" protected species or habitat, the agency is required to initiate formal consultation. An agency may avoid formal consultation only when it has determined that the proposed action is "not likely to adversely affect" the protected species or habitat <u>and the Service [the FWS] concurs with that determination</u>." *Tinoqui-Chalola Council of Kitanemuk and Yowlumne Tejonindians v. Dep't of Energy*, 232 F.3d 1300, 1306 (9th Cir. 2000) (emphasis added).

A "not likely to adversely affect" finding is appropriate if the effects on a species are *de minimis*, in that they are "discountable, insignificant, or completely beneficial." ESA Consultation Handbook § 3.5 at 3-12. "Insignificant" impacts are those that "never reach the scale where take occurs," and that a person would not "be able to meaningfully measure, detect or evaluate." *Id.* "Discountable" effects are those extremely unlikely to occur. *Id.* Whereas, a "likely to adversely affect" finding, which triggers formal consultation, is the appropriate conclusion if any adverse effect to a listed species may occur as a direct or indirect result of a proposed action or its interrelated or interdependent actions. *Id.* at 3-13; *see also,* (Administrative Record (AR) at V10, D2: Guidance Criteria).

Once the agency enters formal consultation, the FWS must issue a biological opinion evaluating the nature and extent of the effect of the agency action on the endangered or threatened species. *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1054 n. 8 (9th Cir. 1994). Where the biological opinion concludes that the proposed action is likely to jeopardize a protected species or adversely modify critical habitat, the agency must modify its proposed

---

[2]The words "effect" and "affect" appear to be terms of art when used in relation to ESA and the distinction has become blurred between the proper grammatical use of "effect" as a noun to mean "result, impression" or used as a verb to mean "to bring about," as compared to the word "affect," which is used as a verb to mean "influence or change." William A. Sabin, *The Gregg Reference Manual* at 283 (9th ed. 2001). Consequently, for the purpose of writing this Order, the Court has used the term as used by the writers of the respective statutes, regulations, agency materials, and cited cases being referenced or relied on by the Court.

action. *Natural Resources Defense Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998). The FWS may suggest "reasonable and prudent alternatives to the proposed action." *American Rivers v. National Marine Fisheries Service*, 126 F.3d 1118, 1122 (9th Cir. 1997) (citing 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3)).

In this way, "the consultation procedure allows the FWS to determine whether the federal action is likely to jeopardize the survival of a protected species or result in the destruction or adverse modification of its critical habitat and, if so, to identify reasonable and prudent alternatives which will avoid the action's unfavorable impacts." *Sierra Club v. Babbitt*, 65 F.3d 1502, 1504 (citing 16 U.S.C. § 1536(b)(3)(A)).

Once the agency enters consultation, § 7(d) provides that "the Federal agency . . . shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures . . ." so as not to violate the ESA. *Id.* It is error to not enjoin activities that "may affect" a protected species on the basis of irreversible or irretrievable commitment of resources prior to consultation. *Pacific Rivers*, 30 F.3d at 1056. Projects that are not irreversible or irretrievable commitments of resources may go forward. *Id.*

To the extent the agency may not make any irreversible or irretrievable commitment of resources until there is a "no affect" or "not likely to affect" determination, § 7(d) is a carrot or stick encouraging agencies to undertake consultation as soon as possible. *Florida Key Deer*, 864 F. Supp. 1234 (early consultation benefits the agency by attaining § 7 compliance so that there is no delay in implementing an action).

Similarly, in the context of both informal and formal consultation, ESA provides that when new information is developed or becomes available that reveals potential effects on a listed species or critical habitat not previously considered the action agency has a duty to reinitiate consultation. 50 C.F.R. § 402.16(b). Reinitiation is also required if the "identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat" that was not previously considered. 50 C.R. R. 402.16(c).

1

### *Factual and Procedural Background of this Case*

2   In 1997, Plaintiff was a party to another law suit against the Defendant, CV 97-666 TUC

3   JMR (lead); CV 97-2562 PHX SMM (consolidated). Plaintiff was one of several environmental

4   groups that sued the Defendant for failing to consult with the FWS before issuing grazing

5   permits on national forest lands in New Mexico and Arizona. In response to the lawsuit, the

6   Defendant initiated informal consultation with the FWS on over 1000 grazing allotments.

7   Because there were so many delinquent § 7 consultations pending, the Forest Service and the

8   FWS agreed to streamline the informal consultation process by adopting Guidance Criteria.

9   The criteria were adopted in February, 1998. They provided specific criteria for determining

10  whether or not grazing on an allotment was likely or not likely to affect an endangered or

11  threatened species or its habitat. If the criteria was satisfied, the allotment "automatically"

12  received a "no affect" or "not likely to affect" determination from the FWS and formal

13  consultation was not required. Hundreds of ESA § 7 consultations were conducted and "no

14  affect" determinations were rendered pursuant to the February-1998 Guidance Criteria. The

15  plaintiffs then amended the complaint to challenge some of the "no affect" determinations, and

16  Judge Roll decided each claim for each allotment in a 90-page Order issued March 30, 2001.

17  The agency action analyzed in these many informal consultations was the issuance of

18  ten-year term grazing permits, but the Forest Service and the FWS limited their consultation

19  period to three years, and agreed to reconsult again in three years. (*See* CV 97-666 TUC JMR,

20  Order filed March 30, 2002 (document 280) at 27.) At the last minute, plaintiffs sought to again

21  amend the complaint to challenge the unlawfulness of the three-year consultation period. Judge

22  Roll held that such an amendment was extremely untimely and denied the request, but he noted

23  "there is a strong argument that the Forest Service and the FWS improperly limited their

24  consultation period to three years, even if the defendant planned to reconsult after the three

25  years expired." (*See* CV 97-666 TUC JMR, Order filed March 30, 2002 (document 280) at 27.)

26  The ESA mandates that the agency analyze the entire agency action to ensure that the

27  action is fully protective of endangered species and corresponding habitat. 16 U.S.C. §

28  1536(b)(3)(A). The scope of the agency action is critical to whether the consultation process

- 6 -

considers all the affects of the action and adequately mitigates potential impacts. Courts have consistently held that a biological opinion has to "analyze the effect of the entire agency action," *Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988), *cert. denied, Sun Exploration & Production v. Luganm*, 489 U.S. 1012 (1989) (emphasis added), including all indirect and cumulative affects of the action on threatened and endangered species, 50 C.F.R. § 402.14(g)(3); 50 C.F.R. § 402.02. An agency may not ignore future aspects of a federal action by segmenting that action into phases.

In *Conner*, the Court held that all phases of oil and gas leasing had to be evaluated for potential impacts at the leasing stage, even though the final construction phase of the oil and gas wells was uncertain to occur. *Conner*, 848 F.2d at 1453-1458; *See also, North Slope Borough v. Andrus*, 642 F.2d 589, 608 (D.C. Cir. 1980 (agency may not deal exclusively with one stage of the project).

In *Connor*, the FWS issued a biological opinion only with regard to the leasing stage because it did not have sufficient data to render a comprehensive opinion beyond the initial leasing phase. Instead of issuing a comprehensive biological opinion, the FWS concluded that the leasing phase did not jeopardize endangered species. The FWS envisioned an "incremental-step" consultation approach, with additional biological evaluations prior to subsequent activities. The court rejected this. The fact that insufficient evidence was available did not excuse the FWS from rendering a comprehensive opinion on the entire agency action. The court explained, as follows:

> Although we recognize that the precise location and extent of future oil and gas activities were unknown at the time, extensive information about the behavior and habitat of the species in the areas covered by the leases was available . . . We agree with appellees that incomplete information about post-leasing activities does not excuse the failure to comply with the statutory requirement of a comprehensive biological opinion using the best information available.

*Conner*, 848 F.2d at 1453-1454.

Judge Roll relied on *Connor*, but under certain limited circumstances some courts have allowed limited incremental consultations. For example, in *Swan v. Turner*, 824 F. Supp. 923, 932 (Mont. 1992), the court allowed the FWS to structure its review incrementally, where the biological opinion envisioned future ESA evaluations at the developmental stages of specific

projects, and the biological opinion included standards and guidelines to protect species and habitat.

Like the case presented to Judge Roll, this case challenges the validity of site-specific informal consultations for a large number of specific allotments. Here, the Plaintiff challenges the use of a three-year consultation period to support the issuance of ten-year term grazing permits for these allotments. Defendant asserts that this challenge is barred by the doctrine of res judicata because Plaintiff seeks to relitigate the issue that should have been raised in the previous action and decided by Judge Roll. The Plaintiff asserts, however, that none of the allotments addressed by Judge Roll are included in this action, with the exception of the Devil's Park allotment. Plaintiff dismisses its claim with respect to this allotment.

In the ninth circuit there are four elements necessary for a finding of res judicata: 1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; 2) whether substantially the same evidence is presented in the two actions; 3) whether the two suits involve infringement of the same right; and 4) whether the two suits arise out of the same transactional nucleus of facts. *Costantini v. Trans World Airlines*, 6821 F.2d 1199, 1201-02 (9th Cir. 1982). The party asserting preclusion bears the burden of showing what was determined by the prior judgment, with clarity and certainty, in order for the trial court to pinpoint the exact issues previously litigated. *Clark v. Bear Sterns & Co.*, 966 F.2d 1318, 1321 (9th Cir. 1992).

Here, the lawsuits do not arise from the same transactional nucleus of facts. Each § 7 consultation is unique depending on the terms and conditions of the permit being renewed, the species residing on the allotment, and the condition of the allotment. The site-specific challenges included in Plaintiff's Complaint all arise from § 7 consultations conducted after Judge Roll's decision. Judge Roll's acceptance of the three-year consultation period[3] was conditioned on the FWS's commitment that it would eventually complete long-term

---

[3]It was dicta when Judge Roll wrote that "there is a strong argument that the Forest Service and the FWS improperly limited their consultation period to three years" because by denying Plaintiff leave to amend the Complaint to add this as a claim, he never needed to reach the merits of the argument.

consultations, covering a period of ten years. (CV 97-666 TUC JMR, Order filed March 30, 2002 at 4.)  The FWS committed to "reinitiate in January 2001 ongoing grazing consultation on all allotments still stocked with livestock that have not been the subject of a new consultation as part of the NEPA/ten-year permit issuance process." *Id.* n.6.  Just as Judge Roll analyzed each permit decision on an allotment by allotment basis, this Court will proceed similarly.  Each grazing permit is its own unique nucleus of operative facts.  With the exception of the grazing allotments adjudicated in CV 97-666 TUC JMR, the Court rejects Defendant's assertion of res judicata. The FWS must defend the rationale for using a three-year consultation period to issue any ten-year term grazing permit on the allotments challenged in this action.

The § 7 consultations required for issuing the ten-year grazing permits were conducted similarly to the § 7 consultations conducted on the allotments involved in Judge Roll's case. Following the adoption of the streamlined § 7 consultations pursuant to the February-1998 Guidance Criteria for ongoing grazing, the Forest Service and the FWS adopted another set of Guidance Criteria in August, 1998, for the purpose of streamlining the ESA consultations required for purposes of NEPA authorization of the 10-year term permits.

The August-1998 Guidance Criteria established specific criteria for determining whether or not grazing on an allotment is likely or not likely to affect an endangered or threatened species or its habitat.  If the criteria are satisfied, the allotment "automatically" receives a "no affect" or "not likely to affect" determination from the Forest Service, concurrence from the FWS, and formal consultation is not required.  These are the informal consultations challenged in this action.  The August-1998 Guidance Criteria provide for specific utilization standards to be in place and for the set standards to be monitored.

Plaintiff alleges that for numerous grazing allotments the Defendant has failed to comply with the monitoring requirements of the August-1998 Guidance Criteria so the "no affect" and "not likely to affect" determinations are no longer valid.  Plaintiff charges that on some allotments utilization limits have been exceeded.  Under both scenarios, Plaintiff argues that the Defendant must now enter into formal consultation with the FWS.

The Defendant argues that in 1995, Congress adopted the Rescissions Act in response to vast numbers of grazing permits that were expiring and requiring NEPA analysis before they could be reissued. Under the Rescissions Act, the Defendant is required to reissue any grazing permit, pursuant to its existing terms, pending NEPA analysis. Defendant argues that under the Rescission Act of 1995, it lacks discretion to alter the terms and conditions of grazing permits prior to implementing a permit pursuant to NEPA. ESA obligations only "apply to actions in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03.

Defendant asserts that only a few, approximately 14 allotments, are covered by NEPA issued permits. (Defendant's MSJ at 13; Defendant's Response at 2; Defendant's Reply at 13.) Only these allotments must be managed in compliance with the August-1998 Guidance Criteria. As to these allotments, the Defendant asserts that the guidance criteria are being satisfied or, if there is any over use, it is not significant enough to trigger the ESA requirement to renew consultation.

The Defendant asserts that under the Rescissions Act, its only discretion over the terms and conditions of the remaining grazing permits lies in its year-to-year regulation of grazing allotments, pursuant to Allotment Management Plans (AMPs) and Allotment Operating Plans (AOPs). Defendant asserts that its obligation under ESA as to ongoing grazing permits is to consult with the FWS regarding the annual affects of the permits.

In light of these defenses, NEPA and the Rescissions Act of 1995 become relevant to this Court's determination of whether the Defendant violated the ESA.

### *National Environmental Policy Act (NEPA)*

NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). In enacting NEPA, Congress sought to assure that environmental, aesthetic, and cultural concerns are considered by federal decision-makers by requiring "the Federal Government to use all practicable means . . . to improve and coordinate Federal planning." 42 U.S.C. § 4331(b).

NEPA obligates an agency to consider every significant aspect of the environmental impact of a proposed action. *Baltimore Gas*, 462 U.S. at 97 (citing *Vermont Yankee Nuclear*

*Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 553 (1978)).  It, also, ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision-making process. *Id.* (citing *Weinberger v. Catholic Action of Hawaii*, 454 U.S. 139 (1981)).

The cornerstone of NEPA is the environmental impact statement (EIS) that an agency must prepare for all "major Federal actions significantly affecting the quality of the human environment . . .." 42 U.S.C. § 4332(2)(C).  An EIS provides a detailed written statement that requires in-depth analysis of all potential environmental impacts.  40 C.F.R. § 1502, 1508.11 (emphasis added).  If, however, the significance of environmental impacts is unclear, the agency may prepare an Environmental Assessment (EA), "a concise public document . . . that serves to briefly provide sufficient evidence and analysis for determining whether to prepare an EIS or a finding of 'no significant impact (FONSI).'"  40 C.F.R. 1508.9(a).  In other words, the EA is a "rough-cut, low-budget [EIS] designed to show whether a full-fledged [EIS] - - which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project - - is necessary."  *Cronin v. United States*, 919 F.2d 439, 443 (7th Cir. 1990).  If the EA results in a finding of no significant impact, the agency does not need to prepare an EIS.  A FONSI, or "Finding of No Significant Impact," means that the agency has determined its action will not have a significant effect on the human environment.

When an agency decides not to prepare an EIS, the EA must supply a "convincing statement of reasons" to explain why a project's impacts are insignificant.  *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998) (citing *Save the Yaak*, 840 F.2d at 717).

The NEPA analysis may be consolidated with the consultation requirements of the ESA, but compliance with NEPA does not relieve the agency of its obligations under ESA.  50 C.F.R. § 402.06.  The two independent statutory obligations are inextricably linked because an ESA "no effect" finding may correlate to a NEPA Decision and FONSI.  And, if the NEPA analysis does NOT result in a FONSI then, by correlation, it must be found that the agency action "may effect" an endangered and/or threatened species, and the agency will be required to enter into

§ 7 consultation under ESA.  Accordingly, it is not uncommon to find NEPA and ESA analysis running concurrently, with the ESA consultation being an integral part of the NEPA analysis.

### *The Rescissions Act of 1995*

In the 1990s, the Forest Service faced a vast number of grazing permits that were expiring.  It became apparent that the Forest Service would be unable to complete all the NEPA analysis in time to reissue the expiring permits.  In response to the looming threat that many permits would not be reissued for failure to complete the NEPA review, Congress enacted the Rescissions Act.[4]  Rescissions Act, Pub. L. No. 104-19, 109 Stat. 194 (1995).

The Rescissions Act established a temporary exemption from NEPA for those permits that were up for reissuance before the NEPA analysis for that allotment had been completed. The Act directed each National Forest to establish and adhere to a schedule for conducting NEPA reviews on all of the grazing allotments in that Forest. Rescissions Act § 504(a), 109 Stat. 194. It also provided that if a grazing permit came up for reissuance before the time stated in the schedule, the FWS must automatically reissue the permit on its same terms, subject to modification or reissuance upon completion of the NEPA analysis. § 504(b), 109 Stat. 194.

The Rescissions Act provides, in relevant part:

(a) SCHEDULE FOR NEPA COMPLIANCE.--Each National Forest System unit shall establish and adhere to a schedule for the completion of [NEPA] analysis and decisions on all allotments within the National Forest System unit for which NEPA analysis is needed. The schedule shall provide that not more than 20 percent of the allotments shall undergo NEPA analysis and decisions through fiscal year 1996.

(b) REISSUANCE PENDING NEPA COMPLIANCE.--Notwithstanding any other law, term grazing permits which expire or are waived before the NEPA analysis and decision pursuant to the schedule developed by individual Forest Service System units, shall be issued on the same terms and conditions and for the full term of the expired or waived permit.

---

[4]The Rescission Act was tacked on to an appropriations bill: "1995 Emergency Supplemental Appropriations for Additional Disaster Assistance, for Anti-Terrorism Initiatives, for Assistance in the Recovery from the Tragedy that Occurred at Oklahoma City, and Rescissions Act."

(c) EXPIRED PERMITS.--This section shall only apply if a new term grazing permit has not been issued to replace an expired or waived term grazing permit solely because the analysis required by NEPA and other applicable laws has not been completed and also shall include permits that expired or were waived in 1994 and 1995 before the date of enactment of this Act.

Pub. L. No. 104-19, § 504, 109 Stat. 194, 212-13 (1995).

### ***Grazing Permits and the ESA, NEPA, and Rescissions Act***

a.   *First Amended Complaint*

Count V of the Plaintiff's Complaint charges that the Defendant has failed to comply with the monitoring and utilization provisions established in the August-1998 Guidance Criteria, relied on to satisfy the § 7 consultation requirements for issuance of approximately 40 NEPA authorized ten-year term grazing permits. Consequently, the "no affect" and "not likely to adversely affect" § 7 determinations, which hinge on these Guidance Criteria, are no longer valid. Defendant must, therefore, reinitiate formal consultation regarding issuance of these term grazing permits.

Plaintiff asserts that the scope of the consultation was only three years, rather than for the full ten year term of the grazing permits. This claim is urged in Count VII of the Complaint and involves approximately 56 allotments.

b.   *Whether the Rescissions Act divests the Defendant of discretion to modify grazing activities to reflect ESA consultation requirements until the implementation of a NEPA authorized grazing permit.*

Authorizing a grazing permit is considered a site-specific project-level decision, which is made through the issuance of a term grazing permit and allotment management plans. 36 C.F.R. § 222.2. Site specific projects must be carried out consistently with the forest plan (Land and Resource Management Plan (LRMP)) in place when the action was implemented. 16 U.S.C. § 1604(i); *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1511-12 (9th Cir. 1992). Term grazing permits are typically issued for 10-year periods and are accompanied by Allotment Management Plans (AMPs), which become a part of the permit and set forth specific grazing prescriptions for the use of the allotment. 36 C.F.R. § 222.3(c)(1), (b)(2). AMPs set forth objectives, management requirements, needed improvements, and monitoring and

evaluation standards for an allotment.  Term grazing permits and AMPs receive site-specific environmental analyses under NEPA and must be consistent with the LRMP.

To implement the term grazing permit, ongoing livestock grazing operations are monitored and adjusted within the scope of the permit and the AMP through issuance of an Allotment Operating Plan (AOP) and Allotment Operating Instructions (AOIs).  The AOP is distinct from the AMP because it offers yearly guidance to the permittee based on the range and resource conditions for that year.  The AOP/AOI should "specify dates and areas of use, utilization standards, maintenance and construction responsibilities for the year." (Defendants' Motion at 5; Exhibit A: Declaration of Berwyn Brown (Brown Dec.) at ¶ 6.)

Defendant argues that NEPA permits have not yet been implemented for the vast majority of the allotments identified in the Plaintiff's Complaint.  Defendant argues that under the Rescission Act of 1995, it lacks any discretion to amend grazing permit terms until a NEPA permit is in place.  Consequently the August-1998 Guidance Criteria, which apply to the NEPA issued permits, are not yet effective.  Prior to the implementation of the NEPA issued permit, the Defendant retains its discretion to administer the grazing permits, through annual instructions to the permittee in the form of an AOP or AOI.  Defendant asserts that it has met its duty to consult under § 7 of the ESA as it relates to this discretionary activity of administering ongoing grazing permits, (Motion at 34 (citing Administrative Record (AR), Vol. 10, Doc. 3 at 11: Biological Opinion), by consultations with the FWS, pursuant to the February-1998 Guidance Criteria.

Defendant's argument hinges on a distinction being drawn between the issuance of a NEPA decision authorizing a ten-year term grazing permit for an allotment and implementation of the permit.  Defendant does NOT assert that the NEPA analysis has not been completed, nor that in relation to this analysis, the § 7 consultation has NOT been done.  Instead, Defendant explains that it takes a long time from when it conducts the NEPA analysis, including the ESA § 7 consultations, to when it issues the NEPA decision authorizing a ten-year grazing permit, and it takes even more time to allow for the requisite lengthy appeal process, including litigation, before it implements a NEPA authorized ten-year term grazing permit.

According to Defendant, then it has discretion to modify the terms of the grazing permit to require compliance with the August-1998 Guidance Criteria.  This point is reached as follows: "[e]ither at the conclusion of the appeals process, which may involve litigation, or the lapse of an appeals period in which no appeal is filed, **and** the Forest Service implements the permit by issuing a bill for collection and annual operating instructions to the permittee." (Forest Service Memorandum in Support of Defendants' Motion for Summary Judgment (Defendant's Motion) at 9) (emphasis added).  "From this period on, "the Forest Service's approval of grazing is covered by [the] separate ESA Section 7 consultation completed in conjunction with the NEPA analysis." *Id.*  The vast majority of the ten-year grazing permits at issue here are still winding their way down this long road.

In the meantime, the Defendant asserts that ongoing grazing on the allotments is covered by a § 7 consultation that is conducted pursuant to the February-1998 Guidance Criteria.(D's M at 34 (citing AR at Vol. 10, Doc. 3: Biological Opinion.)  It is the Defendant's opinion that "as long as it consults on its management of these allotments for a period of at least one year, it is consulting with the FWS on the entire term of the agency action over which it has discretion." (D's Motion at 34.)  It would, however, be extremely taxing for the Forest Service and the FWS to consult on a yearly basis so instead they have agreed to a three-year consultation period, with the Forest Service agreeing to maintain annual operating plans as-is or more restrictively than provided for in the AOP/AOIs.  *Id.*  By agreeing to manage the allotments in this way, the Forest Service and the FWS are able to assess year-to-year affects of grazing for a three-year permit period. *Id.* (citing AR, Vol. 10, Doc. 3: Biological Opinion at 11.)

Defendant is wrong to interpret the Rescissions Act as authorizing this lengthy suspension of its discretion to modify grazing permits.  "Upon the completion of the scheduled NEPA analysis and decision for the allotment, *the terms and conditions of existing grazing permits may be modified or re-issued, if necessary to conform to such NEPA analysis*." *Federal Lands Legal Consortium v. United States,* 195 F.3d 1190, 1200 (10th Cir. 1999) (quoting Pub. L. No. 104-19, § 504, 109 Stat 194, 212-213 (1995); the Rescissions Act § 504 (1995))

1   (emphasis in original).  The Forest Service may not extend the time for conducting the NEPA

2   analysis beyond the time set in the adopted schedule.  *Greater Yellowstone Coalition v.*

3   *Bosworth*, 209 F. Supp. 2d 156 (D.C. Cir. 2002).  The Rescissions Act only provides a

4   temporary exemption from the requirements of NEPA. *Id.* at 158.

5       In *Greater Yellowstone*, the Forest Service had set a deadline in its Rescissions Act

6   schedule of 1998 to complete the environmental analysis and issue the NEPA decision for the

7   grazing permit on the Horse Butte allotment.  The date came and went and the Forest Service

8   failed to initiate, let alone complete, the NEPA analysis for Horse Butte.  The Forest Service

9   revised the NEPA deadline to a later date, and invoking § 504(b) of the Rescissions Act, it

10  reissued the permit for the allotment for another 10 years on the same terms.   The plaintiff

11  argued, and the district court agreed, that the original Rescissions Act schedule, published in

12  1995, set the NEPA compliance deadline and when the deadline passed, the window of

13  exception closed.

14      The district court reasoned persuasively that it was not the purpose of the Rescissions

15  Act to relieve permittees entirely of the consequences of not completing its NEPA obligations.

16  "Rather, the Act creates a temporary exemption from NEPA and relieves the permittees of harsh

17  consequences only if the Service [FWS] had adopted and adhered to a schedule." *Id.* at 162-163.

18  The court held that because the agency had not adhered to the schedule, but instead extended

19  NEPA compliance by several years, the narrow protection afforded the permittees did not apply.

20  *Id.*  Since the Rescission Act did not apply to the permit reissuance for the Horse Butte

21  allotment, the court concluded that the Forest Service violated NEPA by failing to conduct a

22  timely NEPA analysis and by issuing the grazing permit without conducting the requisite NEPA

23  analysis. *Id.* at 163.

24      The court's interpretation in *Greater Yellowstone* was solidly based on the plain language

25  of the Rescissions Act and bears repeating here:

26      The Rescission Act's plain language indicates without ambiguity that the Service
        [FWS] may not amend its § 504(a) schedule for NEPA compliance. As a
        fundamental principle of statutory interpretation, a court is required to give effect
27      to every word Congress uses in a statute. *Reiter v. Sonotone Corp.*, 442 U.S. 330,
        339, 99 S. Ct. 2326, 60 L.Ed.2d 931 (1979). The word "adhere" can only lend
28      itself to one interpretation. Webster's defines "adhere" to mean to "bind oneself

- 16 -

to observance (as of a treaty)." *Webster's Third New International Dictionary* 25-26 (1976). Thus, when Congress commanded the Service [FWS] to "establish and adhere to a schedule" for NEPA compliance, it left no room for the Service [FWS] to later modify that schedule.

Indeed, the words "modify" and "amend" are antonyms of the word "adhere." To say that one has adhered to a schedule that one has modified, amended and changed is to utter a non sequitur or an oxymoron, like a dirty, clean handkerchief.

The necessity of adhering to the plain language of a statute is, in one sense, a constitutional necessity. Judicial reluctance to be guided by the plain meaning of a statute raises an intolerable risk that the court will substitute its judgment for the legislature's. *Public Citizen v. United States Department of Justice*, 491 U.S. 440, 468, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989)(Kennedy, J., concurring). Hence, the judiciary restricts itself to the language's plain meaning unless the result reached is absurd or violates an easily perceived legislative purpose. *Id.*; *Detweiler v. Pena*, 38 F.3d 591, 594-95 (D.C.Cir.1994)(that one might disagree with result of application of plain meaning of statute does not render that result absurd). *See also American Water Works Ass'n v. EPA*, 40 F.3d 1266, 1271 (D.C.Cir.1994); *Nat'l Treasury Employees Union v. Devine*, 733 F.2d 114, 120 (D.C.Cir.1984)(plain meaning prevails unless result is absurd or utterly inconsistent with legislative purpose).

*Id.* at 161-162.

In *Greater Yellowstone*, the court suspended grazing on the Horse Butte allotment until the NEPA process had been completed and issued a declaratory judgment that the Forest Service had violated NEPA. *Id.* at 163.

The Rescissions Act allows the Forest Service to temporarily delay the requisite NEPA analysis, until the date specified in the Rescission Act Allotment Schedules, issued February 1996. (*See attached*: Forest Service Allotment Schedules 1996-2010, February 1996) The Schedule for the Southwestern Region, (R-3) is attached and made part of this Order. It reflects a 15 year plan for completing approximately 1,093 NEPA allotment analyses and decisions in the Southwestern Region. (*See also* Plaintiff's Reply at Ex. 4 & 5.) The plan reflects that 442 NEPA decisions would be completed from 1996 to 1998; 310 from 1999 to 2001; 233 from 2002 to 2004; 88 from 2005 to 2007, and 20 from 2008 to 2010. (*See attached*, National Allotment Schedule Summary, February 8, 1996.) The schedule identifies approximately 265 NEPA decisions that should have been completed in the Southwestern Region between 1998 and 2000. (*See attached* Schedule at 7-14.)

- 17 -

1    The Court finds that the Rescissions Act does not divest the Defendant of its discretion

2    to modify grazing permits outside the window of time afforded it by the Rescissions Act

3    Allotment Schedule.  The Rescissions Act does not support the Defendant's assertion that it

4    must wait for some lengthy administrative and judicial appeals time to run prior to modifying

5    a grazing permit after a NEPA decision is issued for an allotment.  The Court finds that such

6    extensive delays, many of which extend over several years, are contrary to the intent of the

7    Rescissions Act, which provided a limited and specific time period of exemption from NEPA

8    compliance.  The extensive delay in implementing the NEPA decisions is also contrary to

9    regulatory provisions for administrative review and appeal of such final agency decisions.

10   c.    *Whether the Defendant must delay implementing a NEPA authorized grazing permit until administrative and judicial appellate review is concluded.*

11        A decision to authorize livestock grazing is subject to administrative review under two

12   sections of the Code of Federal Regulations: 36 C.F.R § 215 et seq. or § 251.80 et seq.

13   Decisions related to issuance, denial, or administration of written instruments to occupy and use

14   National Forest System lands may be appealed by permit holders under 36 C.F.R. § 251,

15   Subpart C, or 36 C.F.R. 215, but cannot be appealed under both regulations.  36 C.F.R. §

16   215.8(c).

17        In both instances, after a lengthy public comment period, the responsible Forest Service

18   official, issues a "Decision Notice," which in this instance includes a "Finding of No Significant

19   Impact (FONSI)."  This is the agency decision to authorize livestock grazing for the particular

20   allotment. Subsequent to the issuance of the Decision Notice, a permittee may file a request for

21   administrative review. (*See Example*: AR, Vol. 1: Benton Creek Allotment at Ex. 6.)

22        Under 36 C.F.R. § 215, the Notice of Decision is published in a local newspaper, 36

23   C.F.R. § 215.9(a), and mailed to interested parties, such as permittees, 36 C.F.R. § 215.9(c).

24   An appeal may be filed within 45 days of the publication of the Notice of Decision, 36 C.F.R.

25   § 215.2, 215.13(a).  If no appeal is filed, implementation of the decision may occur on, but not

26   before, 5 business days from the close of the appeal filing period. 36 C.F.R. § 215.10(a). If an

27   appeal is filed, implementation may not occur for 15 days following the disposition of the

28   appeal. 36 C.F.R. § 215.10(b).  An appeal must be decided not later 45 days after the end of

the appeal filing period. 36 C.F.R. §§ 215.13(f)(3), 215.17(a). The appeal decision constitutes the final administrative determination of the Forest Service, 36 C.F.R. § 215.215.18(c); thereafter, the agency's decision, Notice of Decision, is subject to judicial review, 36 C.F.R. § 215.20.

Under 36 C.F.R. § 251, Subpart C, the permittee may appeal the Decision Notice because it relates to occupancy and use of National Forest system lands. The filing of the notice of appeal must be within 45 days of the date on the Notice of Decision. 36 C.F.R. § 251.88(2). Decisions made by the District Ranger, like those at issue here, are subject to two levels of review. 36 C.F.R. § 251.87(c). Both levels require the Reviewing Officer to issue a decision within 30 days of the date the record is closed. 36 C.F.R. § 251.99. Compilation of the record, especially at the first level of review can be time consuming, 36 C.F.R. § 251.98, involving intervention and responsive briefs, 36 C.F.R. §§ 251.94; 251.96, and time extensions may be granted for any phase of the appeal, except for the filing of the notice of appeal, 36 C.F.R. § 251.89. There is also a possibility of discretionary review, which if granted must be conducted within 30 days. 36 C.F.R. § 251.00.

A decision may be implemented during this appeal process, unless the Reviewing Officer grants a stay or unless a term grazing permit holder appeals a decision and simultaneously requests its mediation. 36 C.F.R. § 251.103 (emphasis added). Mediation lasts 45 days, but may be extended for an additional 15 days. *Id.* If not resolved by mediation, the appeal is reinstated for administrative disposition. *Id.*

Whether or not to stay implementation of a decision pending an administrative appeal depends on the specific adverse effects upon the requester; harmful site-specific impacts or effects on resources in the area affected by the activities to be stopped; and how the cited effects and impact would prevent a meaningful decision on the merits. 36 C.F.R. § 251.91. The Reviewing Officer considers the validity of any claim of adverse effect on the requester and the effect that granting a stay would have on preserving a meaningful appeal on the merits. *Id.*

These regulatory provisions do not support the Defendant's argument that it is legally obligated to delay implementation of the NEPA permits because of administrative and judicial

1  appeals. A Decision Notice becomes effective no later than the 45 day appeal period from its

2  issuance, unless an appeal is filed pursuant to 36 C.F.R. § 215 or 36 C.F.R. § 251. Under either

3  provision, the proscribed delay is about another 60 days, but the type of extensive delay which

4  has occurred on many of the allotments at issue here occurs only if the permittee requests and

5  is granted a stay, either administratively or judicially.[5]

6      The Court rejects Defendant's assertion that there are only 14 allotments covered by

7  NEPA issued opinions. For the vast majority of the allotments identified in Plaintiff's First

8  Amended Complaint, decision notices have been issued. Plaintiff identified 119 allotments that

9  have had site-specific NEPA decisions issued since September 1, 1998.[6] (Plaintiff's Book of

10  Exhibits at Ex. 2: Declaration of Stade at ¶ 49: 60-day notice letter on October 12, 2000 at p.

11  3.) Unless the NEPA decision is in mitigation or on appeal and stayed, these allotments should

12  be in compliance with the NEPA decision, which depended on the ESA analysis of "no affect"

13  or "not likely to affect" determination made pursuant to the August-1998 Guidance Criteria.

14  d.  *Whether the February-1998 Guidance Criteria or the August-1998 Guidance Criteria apply to the grazing activities permitted on an allotment.*

15      On September 18 and 24, 1998, the FWS issued its concurrence to the August 25, 1998,

16  Guidance Criteria, which were to serve as the criteria for determining whether formal

17  consultation under §7 of the ESA was necessary before issuing a ten-year term grazing permit

18  or whether the permitted activity could be deemed, pursuant the August-1998 Guidance

19  Criteria, to have "no affect" on an endangered or threatened species or "not likely to adversely

20  affect" an endangered or threatened species. (AR at Vol. 10, Ex. 1: Guidance Criteria, August

21

22      [5]To obtain a preliminary injunction in a judicial proceeding there must be a likelihood of success on
23  the merits and a possibility of irreparable injury, or the existence of serious questions on the merits and
    a balance of hardship tipping in favor of the requestor. *National Wildlife Fed'n v. Burlington N. R. R.,*
24  *Inc.*, 23 F.3d 1508, 1510 (9th Cir. 1994). Under ESA, Congress removed the traditional equitable
    discretion held by the courts over injunction proceedings when balancing the parties' competing interest,
25  and tipped the scale in favor of endangered species by giving them the highest of priorities. *Id.*
26  Consequently, the balancing of harm cuts against those challenging the implementation of NEPA
    Decisions issued by the Forest Service.

27

28      [6]Compare this with the 265 allotments the Rescissions Act Allotment Schedule identified for
    issuance of NEPA decisions for this same time frame.

1   25, 1998 at Appendix A.)  While the use of the Guidance Criteria required concurrence from

2   the FWS, which it issued pursuant to the September 18 Concurrence Letter, if the "no affect"

3   finding or the "may affect, not likely to adversely affect" finding for a grazing permit was made

4   pursuant to the August-1998 Guidance Criteria, there was no further concurrence required and

5   informal consultation would be concluded.  (AR at Vol. 1, Ex. 2: September 18 and 24, 1998

6   Concurrence Letters.)

7        The August-1998 Guidance Criteria is an extensive document, (*see* AR, Vol. 10, Ex. 1:

8   Guidance Criteria, August 25, 1998), covering threatened and endangered species and proposed

9   threatened and endangered species (TEPs) subject to grazing activities in the Southwestern

10   Region. The discussion for each species includes information on its ESA status, such as when

11   it was listed, where it occurs on federal lands, and whether there is a recovery plan, and the state

12   status of the species. (Vol. 10, Ex. 1: Guidance Criteria, August 25, 1998 at Appendix A.) The

13   Guidance Criteria provides specific criteria for each of the three possible findings ("no affect,"

14   "not likely to adversely affect," and "likely to adversely affect") for endangered or threatened

15   species by group or individually. *Id.*

16        Contrary to Defendant's assertion, the Guidance Criteria include specific utilization

17   standards and monitoring provisions.  For example, the following criteria assess the effect of

18   ongoing grazing on threatened, endangered, and protected (TEP) fish:

19   MAY AFFECT, NOT LIKELY TO ADVERSELY AFFECT

20   1.     Livestock grazing occurs at any time of the year on the allotment, and all of the following are met:

21        A.    TEP species or their habitats are present within the allotment or the

22   subwatershed, based on the findings of a fishery biologist, and

23        B.    Take (see definition) is avoided by year-long exclusion of livestock from occupied habitats, and exclusion of livestock from unoccupied suitable and potential habitats from 3/1 - 6/1 each year.

24   Livestock use of stream crossings or watering points could constitute an exception to the above if a journey-level fishery

25   biologist has used criterion D below to determine appropriate locations.

26

27        C.    The subwatershed is in satisfactory condition or is recovering at near-natural rates in the presence of livestock grazing. **Range utilization standards that contribute to a healthy watershed are**

28   **in place, and are being monitored.**

D.   **Site inspections have been conducted within the previous year by a journey-level fish biologist. The biologist surveyed stream habitats for suitability, occupancy, and overall condition (e.g., bank stability, stream morphology, embeddedness), has evaluated riparian vegetation, upland conditions, watershed and soil survey results, and has determined these data support the absence of any measurable on-going effect on the species or its habitat. For upland conditions, grazing utilization levels will be consistent with the LRMP guidelines and key areas used for monitoring will be biologically relevant to the well-being of the listed species.**

(AR, Vol. 10: Ex. 1: Guidance Criteria, August 25, 1998 at 3) (emphasis added). For fish, the criteria are provided by habitat, but for terrestrial species, the criteria are provided by species.

For the jaguar, jaguarundi, and ocelot a "not likely to adversely affect" determination can be made only if the "normal livestock activities within riparian areas does not reduce cover." *Id.* at 21, 22, 25.

For the lesser long-nose bat and the Mexican long-nose bat, a "not likely to adversely affect" determination is appropriate if "livestock grazing results in utilization forage (by weight) of no more than 45 % within the allotment containing food plants utilized by the bats (unless site conditions require less than 45 % maximum use); and a monitoring/research plan is in effect at the Forest level to evaluate the relationship between livestock grazing and food plant distribution, abundance, recruitment, and ecology." *Id.* at 27, 30.

The criteria for the Aplomado falcon, is "livestock grazing occurs within occupied, suitable unsurveyed, or potential unsurveyed Aplomado falcon habitat only in concert with a monitoring program to determine responses of the habitat and the falcon to grazing, and areas of savannahs with yucca and scattered trees are being maintained for prey production and nesting habitat." *Id.* at 37.

The criteria for the cactus ferruginous pygmy owl is "livestock grazing is limited to utilization levels that avoid degradation of composition and vigor of understory vegetation or that preclude regeneration of any strata of vegetation, and is limited to 30 % utilization in desert scrub and xeroriparian areas and no more than 30 % of the apical stems of seedling/sapling (0-6 feet) woody riparian species such as willows and cottonwoods in riparian areas in a given year"

and "below 4000' elevation, mature vegetation outside riparian . . . is maintained with good ground cover for the preybase." *Id.* at 40.

The criteria for the Mexican spotted owl requires grazing levels that "provide the woody and herbaceous vegetation necessary for cover of rodent prey species, good to excellent range and ecological condition . . . and that will support the implementation of fire management that would reduce the risk of catastrophic wild fire in the Forest." *Id.* at 44.

For the southwestern willow flycatcher, a "not likely to adversely affect" determination may be made if grazing is permitted on an allotment, but livestock must be over five miles from occupied habitat during breeding season or two miles with trapping and monitoring, or an approved research program is in place; livestock grazing in unoccupied suitable habitat does not reduce the suitability; and grazing in potential habitat does not slow the progression of potential towards suitability in that regeneration or maintenance of woody vegetation is not impaired by trampling, bedding, or feeding and livestock grazing occurs during the dormant season only, and monitoring is in place and the results show that suitability is being maintained or enhanced. *Id.* at 53.

September 18, 1998, when the FWS concurred with the use of the August-1998 Guidance Criteria for determining whether grazing activities had "no affect" or were "not likely to adversely affect" endangered species, they added several conditions, including the following:

> For both the "no effect"[7] and "not likely to adversely effect"[8] determinations to remain in effect for the life of the term permit (up to 10 years), yearly confirmation throughout the lifetime of the permit must take place to ensure the criteria for those findings continue to be met.

(AR, Vol. 10, Ex. 2: September 18, 1998 Concurrence Letter at.) (emphasis added).

Under § 7 of the ESA and the August-1998 Guidance Criteria, before it issues the NEPA Decision, the Forest Service must determine whether grazing activities can meet the "no affect" or "not likely to adversely affect" standards as established by the Guidance Criteria. This process is the mechanism by which the Forest Service ensures that the grazing activities it is

[7]*See* n. 2.

[8]*See n. 2.*

permitting for ten years are not likely to jeopardize the continued existence of any endangered or threatened species.   The Forest Service analysis is presented in the form of a Biological Assessment, which documents how the determinations of "no affect" and "not likely to adversely affect" have been reached pursuant to the August-1998 Guidance Criteria. (AR, Vol. 1, Ex. 2: September 18, 1998 Concurrence Letter at 2.)

For example, using the August-1998 Guidance Criteria, on September 17, 1998, the Forest Service issued the Biological Assessment of "no affect and "not likely to adversely affect" for the Basin Allotment, (AR, Vol. 1, Ex. 1: Biological Assessment.) On September 24, 1998, the FWS issued its concurrence by sending a copy of the September 18, 1998 Concurrence Letter to the Forest Service.  (AR, Vol. 1, Ex. 2: September 24, 1998 letter.)

The Biological Assessment of the affects of an action on endangered, threatened, and protected species becomes a major part of the NEPA analysis, which is a comprehensive environmental analysis providing for extensive public comment and consideration of social and economic factors related to issuing grazing permits.  The NEPA analysis issued in the form of a Decision Notice must result in a FONSI, "finding of no significant impact," before the Forest Service may issue the grazing permit.

For example, the Forest Service issued its Decision Notice and FONSI for the Basin Allotment on **June  22, 1999.**[9]  (AR, Vol. 1, x. 4: Decision Notice.)  The Decision Notice provided for a reduction in number of livestock and a change in the season of use for the allotment.  (AR, Vol. 1, Ex. 4: Decision Notice at 2.)  Under the regulations, the Decision Notice would have been effective within approximately 45 days, if there was no appeal. Pursuant to the Decision Notice, however, the permittee was given one year written notice of the change.  *Id.* (new 10 year term grazing permit to issue in 1999 for the new numbers and season; change in the season of use to be effective until the 2000 grazing season).  The Permit Modification for the Basin Allotment was not, however, issued until **January 29, 2001**, so, according to the Defendant, **January 29, 2001** became the effective date for the **June 22, 1999**

---

[9]The Rescission Act Schedule set the Basin Allotment NEPA analysis and decision deadline as 1997. (Allotment Schedule at 2.)

NEPA decision for the Basin Allotment.   In other words, none of the standards nor the monitoring requirements of the **August-1998** Guidance Criteria applied to the allotment in 1998-2000. (AR, Vol. 1, Ex. Basin; Defendant's SOF, Brown Dec. at ¶ 32.)

According to the Defendant, up until the NEPA authorized ten-year term grazing permit is implemented, it applies the February-1998 Guidance Criteria, which it uses to assess the year-to-year affect of ongoing grazing.  Plaintiff has not challenged the use of the February-1998 Guidance Criteria in relation to the annual permitting activities of the Forest Service, but only asserts that the February-1998 Guidance Criteria, which are based on the affects of grazing over three-years, may not be used to assess the affect of a ten-year term grazing permit.  Defendant would be prohibited from doing this because the scope of the agency action determines the scope of the ESA § 7 analysis.  *(See* this Order at 6 (discussing Judge Roll's Order at 27); *Conner v. Burford*, 848 F.2d at 1453) (the entire agency action must be analyzed under ESA, so ten-year term grazing permits cannot be based on three years)).

Defendant's assertion that the ten-year term permits it issues pursuant to NEPA are based on the August-1998 Guidance Criteria calls into question Count VII of Plaintiff's First Amended Complaint that 56 allotments (First Amended Complaint at Exhibit 5) have been issued ten-year term grazing permits based on the three year consultations (February-1998 Guidance Criteria) rather than ten year consultations (August-1998 Guidance Criteria).  (P's Reply at 19.)

Plaintiff admits that since it compiled the First Amended Complaint, many of the 56 allotments have received new NEPA authorized permits based on new ESA consultations, pursuant to the August-1998 Guidance Criteria, covering the entire ten-year term of the permit. *Id.*  "Forest Guardians [Plaintiff] agrees that its claim with respect to these allotments is moot." *Id.*  The Plaintiff is also willing to accept the Defendant's position that the Forest Service does not need to informally consult on allotments where "no affect" findings were made. *Id.* at 19-20; *see also, Tinoqui-Chalola Council*, 232 F.3d at 1306 (if the agency determines its action "may affect" protected species or habitat, the agency is required to initiate formal consultation); 50 C.F.R. § 402.14.  Consequently, the Court believes that there may not be any NEPA

1   authorized ten-year term permits, based on the February-1998 Guidance Criteria (three year

2   consultations), and that Count VII may be dismissed.[10]

3       As for any allotment where a NEPA Decision has issued authorizing a ten-year term

4   grazing permit, the Court rejects the Defendant's argument that it may continue to monitor the

5   grazing on an allotment pursuant to some lesser standards, such as the February-1998 Guidance

6   Criteria for ongoing grazing activities, until it implements the new permit.   Unless the

7   Defendant can document some later effective date for a Decision Notice, pursuant to the

8   provisions of 36 C.F.R. § 215 or § 251, the standards and monitoring requirements established

9   for purposes of the ESA consultation apply to the allotment, approximately 45 days after the

10  issuance of the NEPA decision. The corresponding ten-year term grazing permit, so authorized,

11  must be issued in a timely fashion, not several years later. Defendant's practice of implementing

12  the grazing permit years later nullifies agency regulations and calls into serious question the

13  ESA analysis, which in most instances was  performed even earlier than the issuance of the

14  NEPA Decision.

15  *e.*     *Whether Defendant must reinitiate ESA § 7 consultation because it delayed in*
        *implementing utilization standards and monitoring requirements necessary to support*
16      *"not likely to adversely affect" determinations made pursuant to the August-1998*
        *Guidance Criteria.*

17       The issue now before this Court is whether or not the ESA consultations, made pursuant

18  to the August-1998 Guidance Criteria, remain appropriate or whether with the passing of time

19  there have been changes which cause the guidance criteria and ESA analysis to become invalid.

20       An agency must reinitiate ESA § 7 consultation with the FWS regarding the affects of

21  its action, if new information reveals effects of the action that may affect endangered,

22  threatened, and protected species and habitat, in a manner or to an extent not previously

23  considered **or if the action is subsequently modified in a manner that causes an effect that**

24  **was not considered in the biological opinion**.  40 C.F.R. § 402.16 (emphasis added).

25  _____

26      [10]If an allotment is covered by a ten-year term permit issued pursuant to the February-1998 Guidance
    Criteria, Count VII would be subject to dismissal if the permit fit within the exception of the

27  Rescissions Act because it was issued prior to the issuance of a NEPA Decision or if the permit was
    issued in relation to CV 97-666 TUC JMR. (The Plaintiff has properly withdrawn the one allotment,

28  Devil's Park, it identified as being res judicata barred because of CV 97-666 TUC JMR.)

The threshold for formal consultation must be set sufficiently low to insure that Federal agencies satisfy their duty to not jeopardize endangered species or adversely modify critical habitat. 51 Fed. Reg. 19,926, 19,949 (June 3, 1986). Therefore, the burden is on the Federal agency to show the absence of likely adverse effects in order to avoid the obligation of formal consultation. *Id.* A "not likely to adversely affect" finding is only appropriate "where the effects on listed species are expected to be discountable, insignificant, or completely beneficial." (AR, Vol. 1, Ex. 2: August-1998 Guidance Criteria; ESA Consultation Handbook § 3.5 at 3-13.) "If the information made available during informal consultation is not sufficient to make 'a not likely to adversely affect' determination, formal consultation is required." 51 Fed. Reg. 19,926, 19,949 (June 3, 1986). A "likely to adversely affect" finding, triggering formal consultation, "is the appropriate conclusion if any adverse effect to a listed species may occur as a direct or indirect result of a proposed action or its interrelated or interdependent actions. . . " (AR, Vol. 1, Ex. 2: August-1998 Guidance Criteria; ESA Consultation Handbook § 3.5 at 3-13.)

If the standards set out in the 1998-Guidance Criteria for a "not likely to adversely affect" determination are no longer satisfied, the FWS's concurrence is no longer appropriate, and the Defendant must initiate formal consultation with the FWS regarding the affect the ten-year grazing permit will have on threatened and endangered species. The Biological Assessment for each allotment documents how the determination of "not likely to adversely affect," pursuant to the August-1998 Guidance Criteria, was reached for that allotment. (AR, Vol. 1, Ex. 2: September 18, 1998 Concurrence Letter at 2.) The Biological Assessment specifies the utilization standard upon which the "not likely to adversely affect" determination is based.

"Allowable use is based on the amount and kind of forage on the allotment, plant needs, and range condition and trend. . . ." (AR, Vol. 1., Benton Creek, Ex. 5: Special Terms and Conditions at ¶ 8.) Generally, the maximum allowable forage use is 25% on poor range, 35% on fair and 40% on good condition range. The maximum allowable forage use for riparian areas in unsatisfactory condition is 25%. . . . for riparian areas in satisfactory condition, it is

45%." (AR, Vol. 1., Benton Creek, Ex. 5: Special Terms and Conditions at ¶ 8.); *see e.g.,* ((AR, Vol. 1, Benton Creek, Ex. 4: NEPA Decision at 1) (allowable forage use, grazing utilization standards, applied in determining capacity are 25% on poor range, 35% on fair range, and 40% on good range)).  To ensure that the "not likely to adversely effect" determination remains in effect for the life of the term permit (up to 10 years), yearly confirmation throughout the lifetime of the permit must take place to ensure the criteria for those findings continue to be met." (AR, Vol. 10, Ex. 2: September 18, 1998 Concurrence Letter at 2.)

The necessary analysis must be made on an allotment by allotment basis.  It requires a comparison of utilization monitoring data to the standards and requirements in the Biological Assessment, to determine if the August-1998 Guidance Criteria, supporting the "not likely to adversely affect" determination in the Biological Assessment, continues to be valid over the term of the permit. (*See e.g.,* AR, Vol. 2, Lake Mountain, Ex. 26 at 1.)    In this way, the documents are interrelated.  The Biological Assessment of "not likely to adversely affect" endangered or threatened species depends on the August-1998 Guidance Criteria, and the NEPA Decision and FONSI[11] depends on the Biological Assessment.  Each builds on the other, until the standards and requirements become the terms and conditions of the grazing permits and annual range management plans. (*See e.g.,* AR, Vol. 2, Lake Mountain, Ex. 3: August-1998 Guidance Criteria at 41 (Mexican Spotted owl); Ex. 8: Biological Assessment; Ex. 7: Decision Notice and FONSI; Ex. 26-27: AOP for 2000; EX. 29-30: Modification of Grazing Permit.)

f.      *Whether grazing on the Lake Mountain Complex in excess of utilization standards and the lack of monitoring in 1999-2000 require the Defendant to reinitiate ESA consultation regarding the affects of grazing on the Mexican Spotted Owl (MSO).*

On March 28, 2000, the Defendant prepared a Compliance Monitoring Report for the Lake Mountain Complex (Doyle Mountain, Mineral, Lake Mountain and Porter Springs allotments) to assess whether or not the informal consultation determination of "not likely to adversely affect" remained valid.  The Biological Assessment for the allotment had been prepared June 23, 1999, and the NEPA Decision and FONSI had issued June 25, 1999.  The

---

[11]Finding of No Significant Impact.

permits were not, however, modified and implemented until June 22, 2000. Even though the Defendant now argues it did not need to comply with the standards and requirements of the ESA consultations until the implementation of the NEPA approved permits, in March of 2000, it nevertheless, prepared a Compliance Report to assess whether it needed to reinitiate ESA consultation due to non-compliance with utilization standards for the Mexican spotted owl (MSO).[12] The analysis in the Report has been especially helpful to the Court, substantively, as well as being an example of the type of analysis required to determine whether Defendant should be directed to reinitiate consultation on allotments where it has allowed utilization levels to be exceeded or failed to monitor utilization levels. (*See* AR, Vol. 2, Lake Mountain, Ex. 25: Compliance Report March 28, 2000.)

The Report begins by noting that the "not likely to adversely affect" determination in the Environmental Assessment[13] was based on an average utilization by all ungulates[14] across the allotment of 26%. (*Id.* at 2 (citing EA at 19).) Using all the monitoring data gathered on the allotment, the District Ranger concluded that the average utilization across the allotment exceeded 32%, and that, therefore, the monitoring results indicated non-compliance with the ESA consultation package. *Id.*

The Report referred to the same provisions that this Court has noted require monitoring, which are the Guidance Criteria provision that "For both the 'no effect' and 'may effect, not likely to adversely affect' determinations to remain in effect for the life of the term permit (up to 10 years), yearly confirmation throughout the lifetime of the permit must take place to ensure the criteria for those findings continue to be met" and the FWS concurrence of September 18,

---

[12]The August-1998 Guidance Criteria for the Mexican Spotted owl specifically ties the "not likely to adversely affect" determination to utilization levels that are sufficient to maintain or restore adequate levels of residual plant cover and food sources for prey species. (AR, Vol. 2, Lake Mountain, Ex. 3: August-1998 Guidance Criteria at 44.)

[13]The Defendant performed an Environmental Assessment for the MSO, which was referred to in the Report, but not included in the Administrative Record provided to the Court. The remainder of the ESA analyses for the Lake Mountain Complex appear to be covered by the Biological Assessment conducted June 23, 1999. (AR, Vol. 2, Lake Mountain, Ex. 8.)

[14]An ungulate is a hoofed mammal.

1998, which reiterated the same condition. (AR, Vol. 2, Lake Mountain, Ex. 26:Compliance Monitoring at 8.). The Report also noted that the NEPA Decision and FONSI was contingent on the implementation of mitigation (utilization and capacity standards, and structural improvements) and monitoring measures. *Id.*

The Report explained that grazing utilization is a point-in-time measurement of herbaceous forage removed by a grazing animal. *Id.* According to the Report, the purpose of compliance monitoring is to validate the implementation of the NEPA Decision as it was presented and used as a basis for determining that the FONSI was made within the spirit of the August-1998 Guidance Criteria, therefore, needing no further consultation with FWS. *Id.* The purpose of effectiveness monitoring is so that management standards are met to ensure range readiness and ensure that allowable herbaceous forage utilization standards are met. *Id.* at 9.

Therefore, forage utilization is first measured just prior to livestock entering a pasture. This establishes the wild ungulate forage use before livestock enter. The next monitoring occurs at the midpoint of the scheduled use period and livestock distribution is noted. Midpoint monitoring determines whether the anticipated forage utilization will be met. Depending on the results, additional monitoring may be necessary. The point of the monitoring is so that when utilization is within 5 % of the desired level, the permittee will begin moving livestock to the next pasture. Final monitoring occurs in each pasture at the end of the growing season. This determines the total forage utilization that occurred as a result of both livestock and wild ungulates. If allowable use is exceeded, adjustments may be made to livestock numbers for the following year. *Id.* at 9.

A review of the Report shows that in 1999 for the Lake Mountain allotment, there was no range readiness monitoring. There was only partial midpoint monitoring for two of eight pastures. Post-livestock monitoring was equally sketchy for four of the eight pastures. Only three pastures had end of the season monitoring. *Id.* at 11. There was also inadequate monitoring of range capacity standards (number of permitted to graze in the pastures). *Id.* at 16-18.

1   The Report determined that utilization levels exceeded 40 % on six of the key areas
2   monitored and concluded that the Defendant was not in compliance with the utilization
3   standards nor the monitoring requirements for the allotment. *Id.* at 14-16. However, the Report
4   noted, "The purpose of monitoring should not be simply to 'comply' with a requirement imposed
5   by an outside agency, but rather should be used to improve or validate our management." *Id.*
6   at 16.

7   To this purpose, the Report looked at the 1999 Environmental Assessment/NEPA
8   Decision for the Lake Mountain allotment, which set the range capacity at 144 head of cattle,
9   in comparison to the 1999 AOP,[15] which continued to permit 225 head of cattle on the
10  allotment. The grazing season had not been reduced as prescribed in the Environmental
11  Assessment. The Report noted that in general there was a correlation of excess use for pastures
12  that were stocked at levels significantly higher than the estimated capacity set in the
13  Environmental Assessment. *Id.* at 16-17. Also, for one pasture wild ungulate use appeared to
14  have been underestimated because the annual precipitation was below normal causing wild elk
15  to stay on the pasture longer than usual. *Id.* at 17. The Report explained that actual use must
16  be established for each pasture within the allotment, or utilization data is close to meaningless
17  because light stocking in a drought year could cause the same utilization level as heavy stocking
18  in a normal year. *Id.* at 18.

19  The Report included recommendations for the immediate implementation of the
20  monitoring, utilization, and capacity standards set out in the Lake Mountain ESA consultation
21  package, "[s]hould it be determined that bringing these projects into compliance with the
22  Guidance Criteria during the upcoming grazing season would avoid formal consultation, . . .."
23  *Id.* at 2. The Report concluded that it was especially important to ensure that the proper level
24  of monitoring continued through the term of the permit in order to continue to validate the
25  determinations of affect and to ensure that the AOP adequately reflected the NEPA Decision.
26  *Id.*

27
28  [15]Annual Operating Plan.

- 31 -

1   From the administrative record it appears that Defendant implemented the ESA

2   consultation provisions in 2000-2001. (AR, Vol. 2, Lake Mountain, Ex. 31, 35- 41.) In 2000,

3   the Annual Operating Instructions were modified to include the utilization standards and

4   monitoring provisions set out in the ESA and NEPA determinations.  (AR, Vol. 2, Lake

5   Mountain, Ex. 47: 1999 MSO[16] Litigation Narrative at ¶ 4.)  The Term Grazing Permits were

6   modified to reflect a three year graduated reduction in permitted livestock numbers to achieve

7   the estimated grazing capacity for the allotment.  *Id.*  Utilization and pre-livestock entry checks

8   were conducted which resulted in resting of several pastures due to drought, excess utilization

9   by wild ungulates and domestic sheep grazing . *Id.*  The Defendant conducted a review of the

10  Lake Mountain Allotment field conditions in 2000 and, subsequently, adjusted the operating

11  plans.  *Id.*   Two temporary employees were assigned to provide allotment unitization

12  monitoring. *Id.*  In 2001, permitted grazing activities were modified to account for site-specific

13  monitoring considerations observed in 2000.  *Id.* at ¶ 5.  Management directives were given to

14  the sheep permittee.  *Id.*  A temporary employee was hired to monitor the 2001 AOI and

15  utilization standards. *Id.*  New GIS maps were distributed to the permittees with accompanying

16  aerial photo coverage to assist in monitoring.  *Id.*

17  According to John Moore, Lakeside District Planning Staff, there was a reduced affect

18  on the MSO protected and restricted habitat.  *Id.*  at 4-5.  According to Berwyn Brown, the

19  Assistant Regional Director of Rangeland Management for the Southwestern Region, standards

20  were met on 11 key areas.  Light overuse occurred on one key area, moderate overuse occurred

21  on 5 key areas, and heavy overuse occurred on 4 key areas. (Defendants Motion for Summary

22  Judgement at Ex. A: Brown Declaration at ¶ 39.)

23  Plaintiff admits that the following monitoring documentation exists in the administrative

24  record: Grazing Permit Activity Record and notes 5/24/01-6/4/01; Grazing Permit Activity

25  Record and notes 6/15/01-7/14/01; three Utilization Monitoring and Permit Compliance

26  Documentation Forms 6/15/01, 7/14/01, and 7/14/01.  (Plaintiff's Reply, Ex. 2: Stade

27

28  [16]Mexican Spotted Owl.

Declaration at ¶ 5.)   In addition, Plaintiff has received monthly reports from Defendant beginning in 2002, including a Grazing Permit Activity Record and notes 8/10/01-2/15/02. *Id.* Plaintiff complains that Defendant only conducted the midpoint monitoring in 2001 dated 5/24/01 and that the Grazing Permit Activity Record from 8/10/01-2/15/02 did not include utilization monitoring of the kind required by the 1998-Guidance Criteria. *Id.* at 6.

According to the Plaintiff, the Court must order the Defendant to reinitiate ESA consultation on the Lake Mountain Allotment, pursuant to 50 C.F.R. § 402.16(c), because utilization standards have been exceeded in some areas and because Defendant has failed to conduct all the required monitoring.  Plaintiff has not, however, argued nor shown that there is any evidence that the "not likely to adversely affect" determination for the MSO is invalid, **and this is the criteria for reinitiating ESA consultation.**  An agency must reinitiate ESA § 7 consultation with the FWS regarding the affects of its action, if new information reveals that the action may affect endangered, threatened, and protected species and habitat in a manner or to an extent not previously considered or if the action is subsequently modified in a manner that causes an affect that was not considered in the Biological Assessment. *See* 50 C.F.R. § 402.16(c). In both instances, reinitiation of consultation hinges on a change in the **affect** of the action.

The Court rejects the Plaintiff's blanket assertion that Defendant must reinitiate § 7 ESA consultation in every instance where it has failed to conduct the required monitoring.  This Court agrees with the Lakeside District Wildlife Biologist's opinion expressed in the Lake Mountain Complex Compliance Monitoring Report, "The purpose of monitoring should not be simply to 'comply' with a requirement imposed by an outside agency, but rather should be used to improve or validate our management." (AR, Vol. 2., Lake Mountain, Ex. 25: Compliance Monitoring at 16.)   On the other hand, it is the monitoring requirement that ensures the utilization standards, which define the scope of the action, will not adversely affect certain species.

Monitoring information is useful to determine if management prescriptions are actually accomplishing what was predicted. *Id.* "In the short term, utilization data can be combined

1    with actual use and climate data to determine resource use levels and identify needed

2    adjustments in management action (BLM 1996)." *Id.* Over the long term, utilization data can

3    be combined with other monitoring data to determine if the management objectives of the

4    Allotment Management Plan are actually being met." *Id.* Monitoring the effectiveness of the

5    utilization standards is the specified mechanism by which the Defendant ensures that grazing

6    on an allotment is "not likely to adversely affect" endangered and protected species.   This

7    explains why the Biological Assessments and NEPA Decisions and FONSIs tie the "not likely

8    to adversely affect" determinations to utilization levels and why they require ongoing

9    monitoring of grazing utilization.

10   For example, the NEPA Decision and FONSI on the first allotment in the record, the

11   Basin Allotment, includes specific actions that must be implemented to support its "not likely

12   to adversely affect" determination.   Grazing must be at a level that balances permitted livestock

13   use with allotment capacity through issuance of a new ten-year term grazing permit for 27 cows

14   and calf pairs with a season of use from 1/1 to 2/15.   (AR., Vol. 1, Basin Allotment, Ex. 4:

15   Decision Notice and FONSI at 1.)[17]   The dormant season allowable forage use levels, called

16

17   [17]Correspondingly, the Biological Assessment for the Basin Allotment, made pursuant to the August-
1998 Guidance Criteria, provides, "The determinations of effects in this document are based on the

18   action as described, improvements listed, and adherence to the specific utilization levels
proposed."(AR., Vol. 1, Basin, Ex. 1: Biological Assessment at 1.)   The Biological Assessment

19   analyzed in detail the Little Colorado spinedace (threatened), located outside the allotment, but in the

20   watershed, and the Mexican gray wolf (proposed), which have the potential to occur in the allotment
or have habitat in the allotment. *Id.*

21   The Biological Assessment reflects the origin of the 27 allowable cow/calf pairs for the
allotment's capacity and the grazing season of 1/1 to 2/15. *Id.* at 5.   It included the two pasture

22   rotational grazing system. *Id.* It scored the vegetation and soil conditions as poor, *id.* at 2, 5, and

23   provided for dormant season allowable forage use of 40 % on herbaceous forage species and 20 % on
woody forage species in all pastures, *id.* at 5.

24   The Biological Assessment found that grazing was "not likely to adversely affect" the spinedace
because the preferred alternative included several measures that would reduce potential downstream

25   impacts and improve watershed and riparian conditions on the allotment. *Id.* at 8.   "Reductions in
livestock numbers and implementation of riparian and upland utilization standards will result in

26   improved upland and riparian conditions." *Id.* "The sub-watershed is expected to recover at near

27   natural rates in the presence of livestock grazing." *Id.* The Biological Assessment included the same
structural erosion control improvement projects later referenced in the NEPA Decision. *Id.* at 3, 8. The

28   Biological Assessment found that the allotment was in the secondary recovery zone of the Mexican gray

1  grazing utilization standards, that were applied to determine of capacity were 40 % on

2  herbaceous plants and 25 % on shrubs. *Id.* The NEPA Decision reconfigured pastures and set

3  a pasture rotational grazing system. *Id.* at 2, 3. It required specific improvements, like fences

4  and erosion control structures, to be constructed to improve distribution of livestock, to reduce

5  forage use in key areas and to improve existing resource conditions and protect the watershed.

6  *Id.* at 3. Similar to Lake Mountain, the Decision Notice for the Basin Allotment explains that

7  the year to year determination to rest a pasture or to rotate cattle on and off pastures will be

8  based on existing resource needs at the time. *Id.* at 2. Similarly, the Basin Allotment Decision

9  specifies, "Monitoring will be conducted by the Forest Service . . . and some utilization

10 monitoring . . . will be conducted in conjunction with Arizona Game and Fish Department as

11 described in the Environmental Assessment." *Id.* at 3.

12      The burden is on the Defendant to show the absence of likely adverse affects to be

13 excepted from the consultation provisions of the ESA. *See* 16 U.S.C. § 1536(a)(2) (agency's

14 duty to ensure that its action is not likely to jeopardize the continued existence of any

15 endangered species or threatened species or result in destruction or adverse modification of

16 habitat for such species). The "not likely to adversely affect" ESA consultation determinations

17 depended on monitoring to make this showing. Yet in the face of this mandate, Defendant

18 failed to monitor utilization standards for many of the allotments. Nevertheless, it is the grazing

19 overutilization of an allotment, with or without monitoring, that may or may not change the

20 scope of the action to an extent that invalidates the affect determination made in the Biological

21 Assessment for the allotment.

22      For example, the Defendant has made a thorough review of monitoring data available

23 for the Lake Mountain Complex, and even though it was incomplete, in combination with other

24 evidence, the Defendant determined that the "not likely to adversely affect" determination

25

26 wolf, and that there was not likely to be any adverse affect because "with the grazing utilization
   standards established, the habitat of the prey base of the wolf is expected to improve." *Id.* at 12.

27 "Livestock grazing on adjacent allotments are also having grazing utilization standards implemented
   intended to provide prey base habitat so there were not even any negative cumulative effects on the

28 species. *Id.*

remained valid if implemented in 2000. Defendant appears to have implemented the utilization and monitoring standards for the allotment in 2000. In the face of no contrary evidence, the Compliance Report for the Lake Mountain Complex and subsequent action of the Defendant is an adequate basis for this Court to determine that the Plaintiff has failed to provide any evidence to support its claim that § 7 ESA consultation must be reinitiated for the MSO regarding the ten-year term grazing permits issued for the Lake Mountain allotment. The record for Lake Mountain and the MSO is, however, unique. The other allotments identified in the Plaintiff's First Amended Complaint do not have similar reports.

Because it lacks monitoring data to establish that the scope of the grazing activities on an allotment has complied with the Biological Assessment, the Defendant instead argues that the forage use guidelines established for the various allotments were set conservatively and that some overuse can occur before long-term damage results, so long as in its professional judgment the overgrazing of an allotment does not warrant reinitiating ESA consultation. (D"s Motion at 24.) The Defendant argues that while the August-1998 Guidance Criteria may have mandated monitoring forage use, it did not require the Defendant to document the monitoring and in its professional judgment, it "is not aware of any information relating to monitoring on these allotments that would require reinitiation of consultation." *Id.*

While the latter argument may be true in that the monitoring requirements set out during consultation may not have specifically said that the Defendant had to "document" the monitoring data, such documentation is necessary for the Defendant to make the evidentiary showing that utilization standards and capacity limitations for an allotment are being met. Documentation is required by ESA. A basic principal of administrative review is that it is made on the record before the agency. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 419 (1971); *Sierra Club v. Bosworth*, 2002 WL 654092 (Calif. 2002) (post-hoc declarations of Forest Service employee cannot be considered because not before the agency at the time of decision). "Allowing the Forest Service to rely on expert opinion without hard data either vitiates a plaintiff's ability to challenge an agency action or results in the courts second guessing an agency's scientific conclusions. Both of these results are unacceptable . . .." *Idaho Sporting*

*Congress v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998); *see also, Blue Mountains Diversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998). While these cases involved NEPA, the rationale applies here.

Without monitoring data, there is little in the record to establish that the provisions relied on for purposes of the ESA consultations remain valid protections for endangered, threatened, and protected species. Without monitoring data, there is little in the record to establish that the August-1998 Guidance Criteria determinations of "not likely to adversely affect" remain valid for the grazing activities that are being permitted on the allotments.

Lacking the monitoring data, Defendant instead relies on the declaration of Berwyn Brown, the Assistant Regional Director of Rangeland Management for the Southwestern Region. (Defendant's MSJ at Ex. A: Brown Declaration.) He explains that the utilization standards set during the ESA consultations were conservative to compensate for poor production years, but that plant needs can be provided for over several growing seasons and may not necessarily be provided each year. (Defendant's MSJ at Ex. A: Brown Declaration at ¶ 18.) The point of his attestations is that some overuse can be sustained without affecting the overall physiological needs of the plants. *Id.* at ¶ 19. He explains that the Court should interpret any over use from the standards set out in an allotment's Biological Assessment and FONSI as follows: an amount of 10% is considered light overuse; 11-20% is considered moderate overuse, and 21%+ is considered heavy overuse. *Id.* In his opinion, light to moderate overuse will not generally contribute to long-term damage to vegetation and soil and water resources. Sustained heavy overuse over time can contribute to poor range and/or watershed conditions. *Id.* "However, regardless of the circumstances, in all cases, managers are expected to take corrective actions when it is determined actual utilization standards have been or will soon be exceeded." *Id.* "The nature of a specific corrective action will depend on both the amount and frequency of overuse." *Id.*

The Court notes that Brown's assertions do not pertain to the effects of overuse on protected species, but is generalized regarding vegetation damage and damage to soil and water. There is nothing in the administrative record to suggest that the utilization and capacity

standards established during the ESA consultations should be loosely applied.  For example, the utilization standards in the Biological Assessment for the Benton Creek Allotment were quite specifically set for the three pastures, as follows: 1) Benton Creek pasture at 35%; 2) Home pasture at 35 %, and 3) Rose pasture at 25 %.  (AR, Vol. 1, Benton Creek, at Ex. 2: Biological Assessment at 8.)  Capacity was set at 19 cow/calf units, with a three pasture rotational season of use from 7/1 to 10/31.  *Id.*; *compare,* (AR, Vol. 1., Benton Creek, Ex. 5: Special Terms and Conditions at ¶ 8) ("Allowable use is based on the amount and kind of forage on the allotment, plant needs, and range condition and trend. . . . The maximum allowable forage use is 25% on poor range, 35% on fair and 40% on good condition range. The maximum allowable forage use for riparian areas in unsatisfactory condition is 25%. . . . for riparian areas in satisfactory condition is 45%.") ; *see also, (*AR, Vol. 1, Benton Creek, Ex. 4: NEPA Decision at 1 (allowable forage use, grazing utilization standards, applied in determining capacity are 25% on poor range, 35% on fair range, and 40% on good range).

Brown's asserted 10 % light overuse, if added to the allowable 25 % usage on poor range, equals 35 %, which is the utilization standard for fair range.  Brown's asserted 11-20 % moderate overuse, if added to the allowable 35 % for fair range, equals 46 to 55 %, which exceed the utilization standards for good range.  In the Compliance Report on the Lake Mountain Complex, the district ranger explained that utilization levels were to be monitored midpoint in the grazing season to determine pasture moves.  (AR, Vol. 2, Lake mountain, Ex. 26: Compliance Monitoring Report at 12.)  "If utilization was within 5 % of the acceptable level, livestock were to move."  *Id.*

The Defendant fails to provide any evidentiary support for its professional judgment that reinitiation of ESA consultation is not warranted.  Defendant may not meet its burden to ensure that grazing is not likely to adversely affect endangered, threatened and protected species by simply being "not aware of any information relating to monitoring on these allotments that would require reinitiation of consultation."  *Id.*

g.      *Conclusions.*

The Court rejects the Defendant's argument that only 14 allotments are covered by the utilization standards and monitoring requirements established for purposes of the ESA consultations by the 1998-Guidance Criteria and the allotment's respective Biological Assessment. The Court rejects the Defendant's argument that August-1998 Guidance Criteria do not apply at the time the NEPA Decision issues, but only upon some later discretionary implementation of the NEPA authorized ten-year term permit.   The Court rejects the Defendant's argument that appeal procedures require the lengthy delays in implementing the NEPA authorized ten-year term grazing permits that the Court sees here. The Court rejects the Defendant's notion that it may establish ESA compliance on the basis of undocumented assertions and unsubstantiated opinions that in its professional judgment the "not likely to adversely affect" ESA determinations remain valid.

On the other hand, the Court rejects the Plaintiff's argument that ESA requires reinitiation of ESA consultation in every instance where the Defendant failed to monitor utilization or allowed over utilization on an allotment. This does not mean that the Court looks lightly on Defendant's lack of compliance with the utilization standards and monitoring provisions it relied on for ESA and NEPA authorization of its grazing permits, but "any" noncompliance cannot *per se* require reinitiation of § 7 ESA consultation.  Such a scheme would be unworkable given the many and changing variables that factor into healthy range management, from which depends the protections for endangered, threatened, and protected species. The Court finds that reinitiation of ESA consultation is required when noncompliance has modified the agency action to an extent that causes an affect not previously considered. 50 C.F.R. § 402.16(c).  The Court is, however, in the untenable position of not being able to determine whether reinitiation of consultation is required under ESA because of the overly simplistic presentation of this case by the parties.

The Defendant has only provided evidence and argument for the 14 allotments that it asserted were covered by NEPA decisions.   In large part it offered Brown's conclusory

professional opinion, instead of facts supported by the Administrative Record, to establish that reinitiation of consultation was not required under ESA.

For example, the Defendant presented the following argument regarding the Benton Creek allotment. The spinedace ESA analysis determined that "watershed conditions are expected to recover at near-natural rates in the presence of livestock grazing," and that optimum habitat condition for the Mexican spotted owl are expected within 10 to 15 years. (Brown Declaration at ¶ 36.) Defendant failed to note that the ESA conclusion regarding recovery of watershed conditions for the spinedace and optimum habitat conditions for the Mexican spotted owl depended on specific utilization levels for the three pastures comprising the Benton Creek allotment: Benton Creek pasture at 35%, Home pasture at 35%, and Rose pasture at 25%. *See also,* (AR, Vol. 1, Benton Creek, Ex. 1: September 24, 1998 Concurrence Letter; Ex. 2: Biological Assessment) (Biological Assessment "not likely to adversely affect" determination based on the same capacity and utilization standards, and same structural projects aimed at protecting riparian areas and improving the movement of livestock on the allotment.)

The Benton allotment was monitored twice. On July 27, 2000, Defendant performed a midpoint check on the Benton Creek pasture. (Plaintiff's Book of Exhibits at Ex. 3.) It reflects that the pasture was used at 30 % as compared to its maximum utilization standard of 25%. *Id.; but see,* (AR, Vol. 1, Benton Creek, Ex. 2: Biological Assessment, Alternative 2) (35 % utilization standard for Benton Creek pasture). The other monitoring document was completed on July 18, 2000 for the Home pasture. It reflects a use level for the Home pasture of 41 %, when utilization was not supposed to exceed 35 %. (Plaintiff's Book of Exhibits at Ex. 3.)

Defendant admitted that there was no monitoring for range utilization performed in 1999, (AR, Vol. 1, Benton Creek, Ex. 6), but based on the 2000 midpoint and post-livestock checks, Brown determined that "[c]orrective measures were not necessary." (Defendant's MSJ at Ex. A: Brown's Declaration at ¶ 36.) Plaintiff argues that both monitoring documents show "excessive utilization." (Plaintiff's Reply at 13.)

The 2000 monitoring reports, one for the Benton Creek pasture and one for the Home pasture, are inadequate to support either conclusion. The Court is concerned that these two

monitoring reports may be the only available evidence regarding the validity of the Benton Creek "not likely to adversely affect" determination, but it is also possible that other evidence has been ignored by the parties because it was not relevant to the arguments they presented in their crossmotions for summary judgment.  For example, the ESA "not likely to adversely affect" determination is more or less likely to be valid or invalid depending on when capacity reductions and three-pasture rotational season requirements were implemented, and/or when the permittee made the erosion control structures and fencing improvements.  Neither side has presented such evidence nor argument.

The Court has rejected the parties' simplistic and narrow approaches to the law and the facts. The Court has clarified the law. Consequently, a ruling on the crossmotions for summary judgment would be premature without supplemental briefing of the issue: whether, on an allotment by allotment basis, the "not likely to adversely affect" decision remains valid or if § 7 ESA consultation must be reinitiated by the Defendant.

First, the parties must identify which allotments listed in Plaintiff's First Amended Complaint are covered by NEPA decisions. The parties must identify the effective date of the NEPA Decision for each allotment.  Any effective date, later than 5 business days from the close of the appeal filing (45 days) period, must be documented for a legitimate delay.  For example, was an appeal being decided pursuant to 36 C.F.R. § 215 or was the matter in mediation, pursuant to 36 C.F.R. 251.  A stay must have been requested and granted to otherwise delay the effective date of a Decision Notice.

Once the allotments, which fall within the confines of this Court's directives as being covered by NEPA decisions, are identified, the remainder shall be subject to dismissal.  The Court assumes, based on the Defendant's presentations that all NEPA decisions have been based on the August-1998 Guidance Criteria and that Count VII of the First Amended Complaint may be dismissed.  The Court does not believe that any ten-year term permits have been issued, pursuant to the February-1998 Guidance Criteria, with the exception of some that may have been reissued under the Rescissions Act prior to a NEPA analysis being conducted on the allotment or issued pursuant to CV 97-666 TUC JMR. If the Court's assumptions regarding

Count VII of Plaintiff's First Amended Complaint are incorrect, the Plaintiff may file a supplemental brief to show cause why Count VII should not be dismissed.

The parties shall jointly prepare and file one document which contains the following information for each allotment: 1) the effective date of the NEPA Decision Notice, 2) documentation justifying any effective date later than the close of the approximate 45 day appeal time; 3) the date the Biological Assessment was completed; 4) identify species that received a "not likely to adversely affect" determination, pursuant to ESA consultation; 5) identify the utilization and capacity standards used for purposes of the ESA "not likely to adversely affect" determination; 5) identify any other requirements, including structural improvements, used for purposes of the ESA "not likely to adversely affect" determination; 6) legible copies of monitoring documents, pertaining to the standards and requirements identified in 4 and 5.

The parties may file separate briefs analyzing the administrative record for each allotment regarding the validity of any "not likely to adversely affect" determination.

**Accordingly,**

**IT IS ORDERED** that the Plaintiff shall file any supplemental brief to show cause why Count VII should not be dismissed within 20 days of the filing date of this Order.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike (document 51) portions of Brown's deposition is DENIED.

**IT IS FURTHER ORDERED** that a status conference shall be held on Wednesday, December 11, 2002 at 10:30 a.m. to determine a schedule for filing supplemental briefs and any supplement to the record.

**DATED** this  25th  day of October, 2002.


David C. Bury
United States District Court

# REGION 3 ALLOTMENT SCHEDULE SUMMARY
February 8, 1996

| FOREST | TOTAL NUMBER OF ALLOTMENT ANALYSES AND DECISIONS | | | | | |
|---|---|---|---|---|---|---|
| | 1996-1998 | 1999-2001 | 2002-2004 | 2005-2007 | 2008-2010 | TOTAL |
| Apache-Sitgraves | 34 | 26 | 25 | 13 | 3 | 101 |
| Carson | 34 | 18 | 13 | 4 | 0 | 69 |
| Cibola | 153 | 65 | 59 | 26 | 6 | 309 |
| Coconino | 12 | 12 | 6 | 0 | 0 | 30 |
| Coronado | 60 | 84 | 41 | 6 | 0 | 191 |
| Gila | 55 | 33 | 31 | 8 | 0 | 127 |
| Kaibab | 8 | 8 | 5 | 4 | 3 | 28 |
| Lincoln | 24 | 23 | 22 | 15 | 0 | 84 |
| Prescott | 18 | 16 | 12 | 6 | 7 | 59 |
| Santa Fe | 21 | 25 | 19 | 6 | 1 | 72 |
| Tonto | 23 | 0 | 0 | 0 | 0 | 23 |
| **Regional Total** | 442 | 310 | 233 | 88 | 20 | 1093 |

**SOUTHWEST REGION (R-3)**
**SCHEDULE OF NEEDED ALLOTMENT ANALYSIS**
**PUBLIC LAW 104-19, SECTION 504 (A)**

**R-3 1996-1998 Allotments**

| FOREST | Dist | Allotment | Allot No | NEPA Planned |
|--------|------|-----------|----------|--------------|
| CARSON | 2 | ALAMOSA | 201 | 1995 |
| CARSON | 4 | BLACK LAKES | 450 | 1995 |
| CARSON | 4 | BLACK LAKES | 450 | 1995 |
| CARSON | 4 | CAPULIN | 451 | 1995 |
| CARSON | 2 | EL RITO LOBATO | 200 | 1995 |
| CARSON | 4 | KNOB | 412 | 1995 |
| LINCOLN | 03 | ACREY | 00300 | 1995 |
| APACHE-SIT. | 5 | CLAY SPRINGS | 00028 | 1996 |
| CARSON | 7 | BLACK COPPER | 701 | 1996 |
| CARSON | 3 | CARRACAS | 330 | 1996 |
| CARSON | 2 | JARITA MESA | 202 | 1996 |
| CARSON | 3 | LAGUNA SECA | 340 | 1996 |
| CARSON | 6 | LAGUNITAS | 607 | 1996 |
| CARSON | 7 | LAKEFORK BALDY | 715 | 1996 |
| CARSON | 4 | LUNA CHACON | 406 | 1996 |
| CARSON | 1 | MOGOTITO | 113 | 1996 |
| CARSON | 4 | RIO PUEBLO | 404 | 1996 |
| CARSON | 7 | RITO SEGUNDO | 719 | 1996 |
| CARSON | 6 | SAN ANTONE MTN | 618 | 1996 |
| CARSON | 6 | SUBLETTE | 600 | 1996 |
| CIBOLA | 3 | BIG ROSA | 03344 | 1996 |
| CIBOLA | 3 | DATIL | 03322 | 1996 |
| CIBOLA | 2 | EL RITO | 02208 | 1996 |
| CIBOLA | 2 | LOS INDIOS | 02202 | 1996 |
| CIBOLA | 4 | PADILLA | 04402 | 1996 |
| CIBOLA | 4 | PERRO | 04411 | 1996 |
| CIBOLA | 2 | SAN LUCAS | 02209 | 1996 |
| CIBOLA | 7 | UNIT 104,108,142 | 07104 | 1996 |
| CIBOLA | 8 | UNIT 112 | 08112 | 1996 |
| CIBOLA | 8 | UNIT 12,16 | 08012 | 1996 |
| CIBOLA | 8 | UNIT 43,127 | 08043 | 1996 |
| CIBOLA | 8 | UNIT 84 | 08084 | 1996 |
| CIBOLA | 8 | UNIT 9,11 | 08009 | 1996 |
| CIBOLA | 8 | UNIT 91-93 | 08091 | 1996 |
| CIBOLA | 3 | WHITEHOUSE | 03326 | 1996 |
| COCONINO | 04 | BAKER LAKE | 00098 | 1996 |
| COCONINO | 04 | CALF PEN | 00097 | 1996 |
| GILA | 09 | AGUA FRIA | 901 | 1996 |
| GILA | 09 | ALAMOCITO | 902 | 1996 |
| GILA | 07 | ALLIE CANYON | 500 | 1996 |
| GILA | 09 | APODACA | 922 | 1996 |
| GILA | 07 | AVALANCHE PEAK | 501 | 1996 |
| GILA | 07 | BROCK CANYON | 722 | 1996 |
| GILA | 07 | CARRIZO | 517 | 1996 |
| GILA | 04 | CEDAR BREAKS | 404 | 1996 |

| | | | | |
|---|---|---|---|---|
| GILA | 05 | DIAMOND BAR | 502 | 1996 |
| GILA | 05 | EAST CANYON | 503 | 1996 |
| GILA | 09 | EL CASO | 908 | 1996 |
| GILA | 07 | FIERRO | 504 | 1996 |
| GILA | 05 | INDIAN CREEK | 227 | 1996 |
| GILA | 09 | JEWETT COMM. | 913 | 1996 |
| GILA | 03 | LANEY | 305 | 1996 |
| GILA | 03 | MANGITAS | 309 | 1996 |
| GILA | 04 | MOGOLLON | 413 | 1996 |
| GILA | 07 | MOGOLLON CR. | 724 | 1996 |
| GILA | 04 | MULECREEK | 414 | 1996 |
| GILA | 02 | POVERTY CREEK | 215 | 1996 |
| GILA | 09 | PUERTO VIEJO | 916 | 1996 |
| GILA | 02 | SOUTH WAHOO | 219 | 1996 |
| GILA | 05 | TAYLOR CREEK | 506 | 1996 |
| GILA | 03 | TORIETTE | 304 | 1996 |
| GILA | 09 | W.SAND FLAT | 921 | 1996 |
| GILA | 04 | WHITEROCKS | 401 | 1996 |
| GILA | 04 | WINCHESTER | 424 | 1996 |
| LINCOLN | 02 | ANTELOPE | 00409 | 1996 |
| LINCOLN | 01 | BAR W | 00104 | 1996 |
| LINCOLN | 03 | BLACK RIVER | 00302 | 1996 |
| LINCOLN | 01 | COMERY | 00110 | 1996 |
| LINCOLN | 01 | FRITZ | 00112 | 1996 |
| LINCOLN | 02 | JAMES CNYN/DRY | 00228 | 1996 |
| LINCOLN | 02 | SACRAMENTO | 00217 | 1996 |
| LINCOLN | 03 | SITTING BULL | 00318 | 1996 |
| PRESCOTT | 03 | CROOKS CANYON | 00307 | 1996 |
| PRESCOTT | 01 | DEL RIO | 00104 | 1996 |
| PRESCOTT | 05 | GRAPEVINE | 00507 | 1996 |
| PRESCOTT | 01 | HORSESHOE | 00108 | 1996 |
| PRESCOTT | 03 | MAVERICK | 00310 | 1996 |
| PRESCOTT | 01 | SAND FLAT | 00105 | 1996 |
| PRESCOTT | 01 | W. BEAR CANYON | 00113 | 1996 |
| SANTA FE | 05 | BEAR LAKES | 00503 | 1996 |
| SANTA FE | 05 | BULL CREEK | 00505 | 1996 |
| SANTA FE | 05 | EL SOLITARIO | 00404 | 1996 |
| SANTA FE | 01 | FRENCH MESA | 00103 | 1996 |
| SANTA FE | 02 | LAGUNA SECA | 00201 | 1996 |
| SANTA FE | 06 | OSO VALLECITOS | 00805 | 1996 |
| SANTA FE | 02 | PALOMAS | 00210 | 1996 |
| SANTA FE | 02 | SIMON | 00203 | 1996 |
| SANTA FE | 05 | TECOLOTE | 00411 | 1996 |
| SANTA FE | 02 | VACAS | 00219 | 1996 |
| TONTO | 06 | GREENBACK | 100 | 1996 |
| APACHE-SIT. | 3 | BASELINE/HRS.SP. | 00303 | 1997 |
| APACHE-SIT. | 6 | BASIN | 00101 | 1997 |
| APACHE-SIT. | 5 | BLACK CANYON | 00014 | 1997 |
| APACHE-SIT. | 4 | CHEVELON CNYN. | 00006 | 1997 |
| APACHE-SIT. | 1 | COWFLAT | 00204 | 1997 |
| APACHE-SIT. | 3 | DARK CANYON | 00308 | 1997 |
| APACHE-SIT. | 3 | GRANVILLE | 00310 | 1997 |
| APACHE-SIT. | 3 | HELL'S HOLE | 00311 | 1997 |

| | | | | |
|---|---|---|---|---|
| APACHE-SIT. | 6 | MURRAY BASIN | 00613 | 1997 |
| APACHE-SIT. | 5 | PIERCE WASH | 00018 | 1997 |
| APACHE-SIT. | 1 | PS | 00122 | 1997 |
| APACHE-SIT. | 1 | RED HILL | 00215 | 1997 |
| APACHE-SIT. | 6 | RUDD CREEK | 00617 | 1997 |
| APACHE-SIT. | 6 | SAFFEL SPRINGS | 00619 | 1997 |
| APACHE-SIT. | 1 | STONE CREEK | 00110 | 1997 |
| APACHE-SIT. | 3 | STRAYHORSE | 00323 | 1997 |
| APACHE-SIT. | 5 | SUNDOWN | 00022 | 1997 |
| APACHE-SIT. | 6 | TABLE TOP | 00623 | 1997 |
| APACHE-SIT. | 5 | VERDE | 00039 | 1997 |
| APACHE-SIT. | 6 | VOIGT | 00625 | 1997 |
| APACHE-SIT. | 6 | WATER CANYON | 00626 | 1997 |
| APACHE-SIT. | 5 | WILDCAT | 00012 | 1997 |
| APACHE-SIT. | 5 | WILLOW WASH | 00027 | 1997 |
| CARSON | 7 | BOBCAT | 702 | 1997 |
| CARSON | 1 | JAROSA-VEGA PAZ | 110 | 1997 |
| CARSON | 2 | SAN GABRIEL | 204 | 1997 |
| CARSON | 6 | SANTOS | 636 | 1997 |
| CARSON | 6 | TCLP | 650 | 1997 |
| CARSON | 6 | TIO GORDITO | 632 | 1997 |
| CIBOLA | 2 | AGUA FRIA | 02226 | 1997 |
| CIBOLA | 4 | BROWN | 04420 | 1997 |
| CIBOLA | 2 | COTTONWOOD/ TUCES | 02220 | 1997 |
| CIBOLA | 3 | DEEP CANYON | 03342 | 1997 |
| CIBOLA | 3 | HORSE MOUNTAIN | 03343 | 1997 |
| CIBOLA | 3 | SAN MATEO | 03335 | 1997 |
| CIBOLA | 6 | UNIT 1,9 | 06001 | 1997 |
| CIBOLA | 6 | UNIT 10 | 06010 | 1997 |
| CIBOLA | 6 | UNIT 103 | 06103 | 1997 |
| CIBOLA | 6 | UNIT 104,100 | 06100 | 1997 |
| CIBOLA | 6 | UNIT 105 | 06105 | 1997 |
| CIBOLA | 6 | UNIT 106 | 06106 | 1997 |
| CIBOLA | 6 | UNIT 107 | 06107 | 1997 |
| CIBOLA | 6 | UNIT 108 | 06108 | 1997 |
| CIBOLA | 6 | UNIT 109 | 06109 | 1997 |
| CIBOLA | 7 | UNIT 109 | 07109 | 1997 |
| CIBOLA | 6 | UNIT 11 | 06011 | 1997 |
| CIBOLA | 6 | UNIT 110 | 06110 | 1997 |
| CIBOLA | 6 | UNIT 112 | 06112 | 1997 |
| CIBOLA | 6 | UNIT 113 | 06113 | 1997 |
| CIBOLA | 6 | UNIT 12 | 06012 | 1997 |
| CIBOLA | 6 | UNIT 12A,17 | 0612A | 1997 |
| CIBOLA | 6 | UNIT 13 | 06013 | 1997 |
| CIBOLA | 7 | UNIT 130 | 07130 | 1997 |
| CIBOLA | 6 | UNIT 14 | 06014 | 1997 |
| CIBOLA | 6 | UNIT 15 | 06015 | 1997 |
| CIBOLA | 6 | UNIT 16 | 06016 | 1997 |
| CIBOLA | 6 | UNIT 18 | 06018 | 1997 |
| CIBOLA | 6 | UNIT 19,47 | 06019 | 1997 |
| CIBOLA | 6 | UNIT 2,3 | 06002 | 1997 |
| CIBOLA | 6 | UNIT 20 | 06020 | 1997 |

| | | | | |
|---|---|---|---|---|
| CIBOLA | 6 | UNIT 21 | 06021 | 1997 |
| CIBOLA | 6 | UNIT 22 | 06022 | 1997 |
| CIBOLA | 6 | UNIT 23,24 | 06023 | 1997 |
| CIBOLA | 6 | UNIT 25 | 06025 | 1997 |
| CIBOLA | 6 | UNIT 26 | 06026 | 1997 |
| CIBOLA | 6 | UNIT 27 | 06027 | 1997 |
| CIBOLA | 6 | UNIT 28 | 06028 | 1997 |
| CIBOLA | 6 | UNIT 29, 30 | 06029 | 1997 |
| CIBOLA | 6 | UNIT 31 | 06031 | 1997 |
| CIBOLA | 6 | UNIT 32 | 06032 | 1997 |
| CIBOLA | 6 | UNIT 33,42 | 06033 | 1997 |
| CIBOLA | 6 | UNIT 34 | 06034 | 1997 |
| CIBOLA | 6 | UNIT 35,39 | 06035 | 1997 |
| CIBOLA | 6 | UNIT 36 | 06036 | 1997 |
| CIBOLA | 6 | UNIT 37 | 06037 | 1997 |
| CIBOLA | 6 | UNIT 38 | 06038 | 1997 |
| CIBOLA | 6 | UNIT 4,8 | 06004 | 1997 |
| CIBOLA | 6 | UNIT 40 | 06040 | 1997 |
| CIBOLA | 6 | UNIT 41,43 | 06041 | 1997 |
| CIBOLA | 8 | UNIT 44,68,70,72 | 08044 | 1997 |
| CIBOLA | 6 | UNIT 44E | 06044 | 1997 |
| CIBOLA | 6 | UNIT 44W | 0644W | 1997 |
| CIBOLA | 6 | UNIT 48 | 06048 | 1997 |
| CIBOLA | 6 | UNIT 5,6 | 06005 | 1997 |
| CIBOLA | 6 | UNIT 50E | 0650E | 1997 |
| CIBOLA | 6 | UNIT 50W | 0650W | 1997 |
| CIBOLA | 6 | UNIT 51,64 | 06051 | 1997 |
| CIBOLA | 6 | UNIT 52 | 06052 | 1997 |
| CIBOLA | 6 | UNIT 53 | 06053 | 1997 |
| CIBOLA | 6 | UNIT 54 | 06054 | 1997 |
| CIBOLA | 6 | UNIT 55,45,111E | 06055 | 1997 |
| CIBOLA | 6 | UNIT 56 | 06056 | 1997 |
| CIBOLA | 6 | UNIT 57,58,59 | 06057 | 1997 |
| CIBOLA | 8 | UNIT 6 | 08006 | 1997 |
| CIBOLA | 6 | UNIT 60 | 06060 | 1997 |
| CIBOLA | 6 | UNIT 61 | 06061 | 1997 |
| CIBOLA | 6 | UNIT 62 | 06062 | 1997 |
| CIBOLA | 6 | UNIT 63,46 | 06063 | 1997 |
| CIBOLA | 6 | UNIT 65 | 06065 | 1997 |
| CIBOLA | 6 | UNIT 66,67 | 06066 | 1997 |
| CIBOLA | 6 | UNIT 68 | 06068 | 1997 |
| CIBOLA | 6 | UNIT 69 | 06069 | 1997 |
| CIBOLA | 6 | UNIT 7,8 | 06007 | 1997 |
| CIBOLA | 6 | UNIT 70 | 06070 | 1997 |
| CIBOLA | 6 | UNIT 71 | 06071 | 1997 |
| CIBOLA | 6 | UNIT 71 NW | 0671W | 1997 |
| CIBOLA | 6 | UNIT 71S,75 | 067071 | 1997 |
| CIBOLA | 6 | UNIT 73 | 06073 | 1997 |
| CIBOLA | 6 | UNIT 74 | 06074 | 1997 |
| CIBOLA | 6 | UNIT 76 | 06076 | 1997 |
| CIBOLA | 6 | UNIT 77 | 06077 | 1997 |
| CIBOLA | 6 | UNIT 78 | 06078 | 1997 |
| CIBOLA | 6 | UNIT 79 | 06079 | 1997 |

Region 3 - 4

| | | | | |
|---|---|---|---|---|
| CIBOLA | 6 | UNIT 80,87 | 06080 | 1997 |
| CIBOLA | 6 | UNIT 81 | 06081 | 1997 |
| CIBOLA | 6 | UNIT 82 | 06082 | 1997 |
| CIBOLA | 6 | UNIT 83 | 06083 | 1997 |
| CIBOLA | 6 | UNIT 84 | 06084 | 1997 |
| CIBOLA | 6 | UNIT 85 | 06085 | 1997 |
| CIBOLA | 6 | UNIT 86 | 06086 | 1997 |
| CIBOLA | 6 | UNIT 88 | 06088 | 1997 |
| CIBOLA | 7 | UNIT 88 | 07088 | 1997 |
| CIBOLA | 6 | UNIT 89 | 06089 | 1997 |
| CIBOLA | 6 | UNIT 91 | 06091 | 1997 |
| CIBOLA | 6 | UNIT 92 | 06092 | 1997 |
| CIBOLA | 6 | UNIT 93 | 06093 | 1997 |
| CIBOLA | 6 | UNIT 94 | 06094 | 1997 |
| CIBOLA | 6 | UNIT 95 | 06095 | 1997 |
| CIBOLA | 6 | UNIT 96 | 06096 | 1997 |
| CIBOLA | 6 | UNIT 97,98 | 06097 | 1997 |
| CIBOLA | 6 | UNIT 99 | 06099 | 1997 |
| CIBOLA | 3 | WEST MONTICEL-LO | 03336 | 1997 |
| CIBOLA | 2 | WINGATE | 02213 | 1997 |
| COCONINO | 04 | BEAVER CREEK | 00112 | 1997 |
| COCONINO | 04 | HACKBERRY/PIVOT | 00007 | 1997 |
| COCONINO | 02 | MAXWELL SPRINGS | 00035 | 1997 |
| COCONINO | 01 | RIM ROCK | 00011 | 1997 |
| COCONINO | 01 | THIRTEEN MILE_ | 00012 | 1997 |
| CORONADO | D3 | A-Draw | 00301 | 1997 |
| CORONADO | D5 | AM FLAG/INNERO | 00506 | 1997 |
| CORONADO | D2 | APACHE SPRINGS | 00240 | 1997 |
| CORONADO | D1 | BARBOOT | 00122 | 1997 |
| CORONADO | D1 | BLACK DIAMOND | 00159 | 1997 |
| CORONADO | D3 | Blacktail | 00307 | 1997 |
| CORONADO | D1 | BOSS | 00126 | 1997 |
| CORONADO | D5 | CANADA DEL ORO | 00503 | 1997 |
| CORONADO | D4 | CEDAR SPRINGS | 00409 | 1997 |
| CORONADO | D1 | COCHISE | 00150 | 1997 |
| CORONADO | D5 | CUMERO | 00520 | 1997 |
| CORONADO | D2 | DEBAUD | 00232 | 1997 |
| CORONADO | D1 | DRAGOON | 00152 | 1997 |
| CORONADO | D1 | EAST WHITETAIL | 00149 | 1997 |
| CORONADO | D5 | FINLEY SPRINGS | 00505 | 1997 |
| CORONADO | D2 | FORT | 00247 | 1997 |
| CORONADO | D2 | GARDNER CAN-YON | 00241 | 1997 |
| CORONADO | D2 | GREATERVILLE | 00238 | 1997 |
| CORONADO | D4 | HARRISON | 00432 | 1997 |
| CORONADO | D4 | HIGH CREEK | 00433 | 1997 |
| CORONADO | D3 | HQ | 00321 | 1997 |
| CORONADO | D1 | HUNT CANYON | 00123 | 1997 |
| CORONADO | D5 | LAST CHANCE | 00516 | 1997 |
| CORONADO | D3 | Lochiel | 00346 | 1997 |

| | | | | |
|---|---|---|---|---|
| CORONADO | D1 | LOWER RUCKER | 00115 | 1997 |
| CORONADO | D1 | MIDDLEMARCH | 00158 | 1997 |
| CORONADO | D4 | NORTH ASH | 00435 | 1997 |
| CORONADO | D4 | O BAR O | 00419 | 1997 |
| CORONADO | D2 | OAK TREE | 00237 | 1997 |
| CORONADO | D2 | ROSEMONT | 00234 | 1997 |
| CORONADO | D1 | SLAVIN | 00154 | 1997 |
| CORONADO | D2 | THURBER | 00236 | 1997 |
| CORONADO | D4 | TWO TROUGHS | 00410 | 1997 |
| CORONADO | D4 | VJ | 00407 | 1997 |
| GILA | 06 | ALEXANDER | 600 | 1997 |
| GILA | 02 | BLACK MOUNTAIN | 223 | 1997 |
| GILA | 04 | COPPER CREEK | 412 | 1997 |
| GILA | 07 | COW CREEK | 705 | 1997 |
| GILA | 04 | DRY CREEK | 407 | 1997 |
| GILA | 09 | GALLO MTN. | 917 | 1997 |
| GILA | 06 | GOVINA | 609 | 1997 |
| GILA | 05 | JORDAN MESA | 505 | 1997 |
| GILA | 06 | LOWER PLAZA | 620 | 1997 |
| GILA | 07 | SHINGLE CANYON | 511 | 1997 |
| GILA | 07 | SPAR CANYON | 727 | 1997 |
| GILA | 04 | TENNESSEE | 422 | 1997 |
| KAIBAB | 4 | ANITA | 34 | 1997 |
| KAIBAB | 4 | CAMERON | 35 | 1997 |
| KAIBAB | 2 | DOG KNOBS | 7 | 1997 |
| KAIBAB | 2 | ELK SPRINGS | 9 | 1997 |
| LINCOLN | 01 | BLOCK | 00106 | 1997 |
| LINCOLN | 02 | C C WALKER | 00423 | 1997 |
| LINCOLN | 01 | CAPITAN GAP | 00109 | 1997 |
| LINCOLN | 02 | CARRISSA | 00425 | 1997 |
| LINCOLN | 03 | DARK CANYON | 00306 | 1997 |
| LINCOLN | 01 | NOGAL LAKE | 00124 | 1997 |
| LINCOLN | 02 | PERK | 00437 | 1997 |
| LINCOLN | 03 | SOLDIER SPRINGS | 00319 | 1997 |
| LINCOLN | 02 | SOWELL | 00447 | 1997 |
| PRESCOTT | 05 | ASH CREEK | 00500 | 1997 |
| PRESCOTT | 03 | BRUSHY | 00302 | 1997 |
| PRESCOTT | 03 | CONTRERAS | 00306 | 1997 |
| PRESCOTT | 05 | DUGAS | 00506 | 1997 |
| PRESCOTT | 05 | LONG GULCH | 00511 | 1997 |
| PRESCOTT | 05 | RICE PEAK | 00514 | 1997 |
| PRESCOTT | 01 | STEPHENS | 00121 | 1997 |
| SANTA FE | 06 | ASPEN MOUNTAIN | 00603 | 1997 |
| SANTA FE | 03 | LOS CONCHAS | 00305 | 1997 |
| SANTA FE | 02 | SAN MIGUEL | 00213 | 1997 |
| SANTA FE | 02 | SENORITO | 00207 | 1997 |
| TONTO | 02 | BOHME | 15 | 1997 |
| TONTO | 05 | BRYANT     MT/SPR CK | 63/79 | 1997 |
| TONTO | 02 | CAPITAN | 17 | 1997 |
| TONTO | 05 | CATHOLIC PEAK | 64 | 1997 |
| TONTO | 06 | CENTER     MOUN-TAIN | 84 | 1997 |

| | | | | |
|---|---|---|---|---|
| TONTO | 04 | CHRISTOPHER MTN. | 46 | 1997 |
| TONTO | 05 | DIAMOND | 69 | 1997 |
| TONTO | 05 | DIAMOND BUTTE | 69 | 1997 |
| TONTO | 02 | DIMARIO | 21 | 1997 |
| TONTO | 04 | ELLINWOOD | 49 | 1997 |
| TONTO | 05 | GENTRY MOUN-TAIN | 65 | 1997 |
| TONTO | 06 | HAVENS | 87 | 1997 |
| TONTO | 04 | POLE HOLLOW | 57 | 1997 |
| TONTO | 05 | POTATO BUTTE | 76 | 1997 |
| TONTO | 02 | RADIUM | 31 | 1997 |
| TONTO | 05 | RED LAKE | 77 | 1997 |
| TONTO | 01 | SEARS-CLUB | 09 | 1997 |
| TONTO | 02 | SLEEPING BEAUTY | 35 | 1997 |
| TONTO | 03 | SUNFLOWER | 41 | 1997 |
| TONTO | 04 | THIRTEEN | 60 | 1997 |
| APACHE-SIT. | 3 | ADBAR | 00301 | 1998 |
| APACHE-SIT. | 1 | BLACK RIVER | 00121 | 1998 |
| APACHE-SIT. | 7 | CA/DO/JUN/LIN/MC | 00033 | 1998 |
| APACHE-SIT. | 1 | COLTER CREEK | 00107 | 1998 |
| APACHE-SIT. | 3 | EAST EAGLE | 00309 | 1998 |
| APACHE-SIT. | 6 | GREER | 00610 | 1998 |
| APACHE-SIT. | 3 | HOG TRAIL | 00313 | 1998 |
| APACHE-SIT. | 5 | LONGTOM | 00011 | 1998 |
| APACHE-SIT. | 3 | LOP EAR | 00315 | 1998 |
| APACHE-SIT. | 1 | NUTRIOSO SUM-MER | 00108 | 1998 |
| CARSON | 4 | ANGOSTURA | 405 | 1998 |
| CARSON | 3 | CABRESTO | 320 | 1998 |
| CARSON | 1 | CANJILON | 101 | 1998 |
| CARSON | 2 | CANO | 206 | 1998 |
| CARSON | 7 | MIDNIGHT MAL-LETE | 707 | 1998 |
| CARSON | 4 | MIRANDA | 456 | 1998 |
| CARSON | 4 | SANTA BARBARA | 403 | 1998 |
| CARSON | 6 | SPRING CREEK | 631 | 1998 |
| CARSON | 4 | TRAMPAS | 401 | 1998 |
| CARSON | 6 | TUSAS | 626 | 1998 |
| CIBOLA | 4 | ENCINO | 04409 | 1998 |
| CIBOLA | 2 | LLANITO FRIO | 02204 | 1998 |
| CIBOLA | 3 | MONICA | 03345 | 1998 |
| CIBOLA | 3 | MULESHOE | 03303 | 1998 |
| CIBOLA | 2 | RAMAH | 02219 | 1998 |
| CIBOLA | 2 | STINKING SPRINGS | 02214 | 1998 |
| CIBOLA | 7 | UNIT 105,106,110 | 07105 | 1998 |
| CIBOLA | 7 | UNIT 119,122 | 07119 | 1998 |
| CIBOLA | 7 | UNIT 121 | 07121 | 1998 |
| CIBOLA | 8 | UNIT 124,125 | 08124 | 1998 |
| CIBOLA | 8 | UNIT 125 | 08125 | 1998 |
| CIBOLA | 7 | UNIT 13,19,138 | 07013 | 1998 |

| | | | | |
|---|---|---|---|---|
| CIBOLA | 7 | UNIT 134 | 07134 | 1998 |
| CIBOLA | 7 | UNIT 144 | 07144 | 1998 |
| CIBOLA | 7 | UNIT 22,24,25,26 | 07022 | 1998 |
| CIBOLA | 7 | UNIT 28,29 | 07028 | 1998 |
| CIBOLA | 7 | UNIT 3,7,8 | 07003 | 1998 |
| CIBOLA | 7 | UNIT 30 | 07030 | 1998 |
| CIBOLA | 7 | UNIT 30,91 | 07030 | 1998 |
| CIBOLA | 7 | UNIT 33 | 07033 | 1998 |
| CIBOLA | 8 | UNIT 38,41 | 08038 | 1998 |
| CIBOLA | 7 | UNIT 4,11,139,12 | 07004 | 1998 |
| CIBOLA | 7 | UNIT 43,45,48 | 07043 | 1998 |
| CIBOLA | 7 | UNIT 5,6 | 07005 | 1998 |
| CIBOLA | 7 | UNIT 53 | 07053 | 1998 |
| CIBOLA | 7 | UNIT 59,66 | 07059 | 1998 |
| CIBOLA | 7 | UNIT 61,63 | 07062 | 1998 |
| CIBOLA | 7 | UNIT 65,69 | 07065 | 1998 |
| CIBOLA | 7 | UNIT 66 | 07066 | 1998 |
| CIBOLA | 8 | UNIT 7,8 | 08007 | 1998 |
| CIBOLA | 7 | UNIT 74,75 | 07074 | 1998 |
| CIBOLA | 7 | UNIT 82,83 | 07082 | 1998 |
| CIBOLA | 8 | UNIT 82,83 | 08082 | 1998 |
| CIBOLA | 7 | UNIT 9 | 07009 | 1998 |
| COCONINO | 05 | DEEP LAKE | 00055 | 1998 |
| COCONINO | 02 | KENDRICK MTN | 00034 | 1998 |
| COCONINO | 05 | PADRE       CYN/ ELLIOT | 00061 | 1998 |
| COCONINO | 05 | PICKETT LAKE/ELL | 00103 | 1998 |
| COCONINO | 04 | WALKER BASIN | 00117 | 1998 |
| CORONADO | D5 | BARNEY | 00517 | 1998 |
| CORONADO | D5 | BELLOTA | 00502 | 1998 |
| CORONADO | D4 | BLACK ROCK | 00404 | 1998 |
| CORONADO | D4 | BULL TANK | 00434 | 1998 |
| CORONADO | D2 | CROSS S | 00204 | 1998 |
| CORONADO | D1 | FAIRCHILD | 00134 | 1998 |
| CORONADO | D3 | Farrell | 00315 | 1998 |
| CORONADO | D2 | FRESNAL | 00203 | 1998 |
| CORONADO | D5 | FRESNO | 00519 | 1998 |
| CORONADO | D3 | Harshaw | 00319 | 1998 |
| CORONADO | D1 | HORSESHOE | 00118 | 1998 |
| CORONADO | D2 | JARILLAS | 00202 | 1998 |
| CORONADO | D3 | Lewis | 00325 | 1998 |
| CORONADO | D1 | LOWERROCK CREEK | 00103 | 1998 |
| CORONADO | D2 | MONTANA | 00207 | 1998 |
| CORONADO | D4 | NORTH REEF | 00402 | 1998 |
| CORONADO | D3 | Oak Bar | 00324 | 1998 |
| CORONADO | D2 | ORO BLANCO | 00206 | 1998 |
| CORONADO | D4 | POLECAT | 00448 | 1998 |
| CORONADO | D5 | REDINGTON PASS | 00504 | 1998 |
| CORONADO | D1 | ROBERTSON | 00144 | 1998 |
| CORONADO | D4 | ROCKY | 00449 | 1998 |
| CORONADO | D3 | Santa Cruz | 00351 | 1998 |
| CORONADO | D2 | SARDINA | 00209 | 1998 |

| | | | | |
|---|---|---|---|---|
| CORONADO | D4 | SOUTH GOODWIN | 00403 | 1998 |
| CORONADO | D1 | WEST END | 00127 | 1998 |
| GILA | 02 | ALEXANDER | 222 | 1998 |
| GILA | 04 | ALMA | 400 | 1998 |
| GILA | 02 | BURNT CABIN | 224 | 1998 |
| GILA | 02 | CORONADODU-ROY | 226 | 1998 |
| GILA | 06 | ORONADONER MT | 614 | 1998 |
| GILA | 06 | DARK CANYON | 605 | 1998 |
| GILA | 03 | DILLMAN CREEK | 308 | 1998 |
| GILA | 06 | LONG CANYON | 611 | 1998 |
| GILA | 04 | PUEBLO CREEK | 310 | 1998 |
| GILA | 07 | READING MTN. | 713 | 1998 |
| GILA | 04 | SACATON | 419 | 1998 |
| GILA | 06 | SU | 613 | 1998 |
| GILA | 03 | TROUT CREEK | 316 | 1998 |
| GILA | 03 | UNDERWOOD LAKE | 306 | 1998 |
| GILA | 07 | WATSON MOUN-TAIN | 728 | 1998 |
| GILA | 05 | XSX | 808 | 1998 |
| KAI | 3 | BUFFALO RANCH | 24 | 1998 |
| KAIBAB | 2 | COWBOY TANK | 52 | 1998 |
| KAIBAB | 3 | RYAN | 31 | 1998 |
| KAIBAB | 2 | SQUAW MTN | 18 | 1998 |
| LINCOLN | 02 | BELL CANYON | 00401 | 1998 |
| LINCOLN | 02 | BOUNDS | 00402 | 1998 |
| LINCOLN | 02 | CRIDEBRING | 00427 | 1998 |
| LINCOLN | 02 | CUEVO | 00428 | 1998 |
| LINCOLN | 03 | NATIONAL | 00313 | 1998 |
| LINCOLN | 01 | WILDERNESS | 00509 | 1998 |
| PRESCOTT | 01 | ANTELOPE HILLS | 00100 | 1998 |
| PRESCOTT | 01 | CHINA DAM | 00102 | 1998 |
| PRESCOTT | 01 | MULDOON | 00109 | 1998 |
| PRESCOTT | 01 | PERKINSVILLE | 00111 | 1998 |
| SANTA FE | 05 | BARBERO | 00502 | 1998 |
| SANTA FE | 03 | CEBOLLA SAN AN-TO | 00303 | 1998 |
| SANTA FE | 01 | CHAMA | 00100 | 1998 |
| SANTA FE | 02 | CUBA MESA | 00214 | 1998 |
| SANTA FE | 05 | PADRE SPRINGS | 00515 | 1998 |
| SANTA FE | 06 | RANCHO VIEJO | 00800 | 1998 |
| SANTA FE | 05 | VALLE GRANDE/AC | 00524 | 1998 |
| TONTO | 02 | GERALD HILLS | 22 | 1998 |
| TONTO | 06 | GREENBACK | 100 | 1998 |

**R-3 1999-2001 Allotments**

| FOREST | Dist | Allotment | Allot No | NEPA Planned |
|---|---|---|---|---|
| APACHE-SIT. | 3 | ALMA MESA | 00302 | 1999 |
| APACHE-SIT. | 7 | ARAB | 00056 | 1999 |
| APACHE-SIT. | 1 | BONEYARD | 00118 | 1999 |
| APACHE-SIT. | 4 | CLEAR CREEK | 00001 | 1999 |
| APACHE-SIT. | 7 | LA/DOB/MIN/PORT | 00057 | 1999 |
| APACHE-SIT. | 7 | LAKE MOUNTAIN | 00055 | 1999 |
| APACHE-SIT. | 1 | NUTRIOSO WIN-TER | 00106 | 1999 |
| APACHE-SIT. | 3 | SARDINE | 00322 | 1999 |
| APACHE-SIT. | 6 | SHEEP SPRINGS | 00622 | 1999 |
| CARSON | 6 | APACHE COMPLEX | 651 | 1999 |
| CARSON | 3 | BANCOS | 310 | 1999 |
| CARSON | 1 | BATEMAN | 100 | 1999 |
| CARSON | 7 | COLUMBINE | 712 | 1999 |
| CARSON | 2 | SALVADOR COM-PLEX | 212 | 1999 |
| CIBOLA | 2 | BRANSON | 02212 | 1999 |
| CIBOLA | 2 | DAN VALLEY/DENT | 02221 | 1999 |
| CIBOLA | 3 | FLYING V | 03324 | 1999 |
| CIBOLA | 2 | LA JARA | 02212 | 1999 |
| CIBOLA | 3 | ROCK HILL | 03320 | 1999 |
| CIBOLA | 2 | SIX A & PREWITT | 02216 | 1999 |
| CIBOLA | 4 | TORREON | 04408 | 1999 |
| CIBOLA | 8 | UNIT 100-123 | 08100 | 1999 |
| CIBOLA | 8 | UNIT 102,105 | 08102 | 1999 |
| CIBOLA | 7 | UNIT 102,143 | 07102 | 1999 |
| CIBOLA | 8 | UNIT 109,147 | 08109 | 1999 |
| CIBOLA | 8 | UNIT 114 | 080114 | 1999 |
| CIBOLA | 8 | UNIT 116 | 08116 | 1999 |
| CIBOLA | 7 | UNIT 126,128,129 | 07126 | 1999 |
| CIBOLA | 8 | UNIT 131-135 | 08131 | 1999 |
| CIBOLA | 7 | UNIT 132 | 07132 | 1999 |
| CIBOLA | 7 | UNIT 135 | 07135 | 1999 |
| CIBOLA | 7 | UNIT 14 | 07014 | 1999 |
| CIBOLA | 7 | UNIT 14,16,17 | 07016 | 1999 |
| CIBOLA | 8 | UNIT 18,20 | 08018 | 1999 |
| CIBOLA | 8 | UNIT 23,51,52 | 08023 | 1999 |
| CIBOLA | 8 | UNIT 24,25,28 | 08024 | 1999 |
| CIBOLA | 8 | UNIT 29,79,80,99 | 08029 | 1999 |
| CIBOLA | 8 | UNIT 31,40,49,66 | 08031 | 1999 |
| CIBOLA | 7 | UNIT 44 | 07044 | 1999 |
| CIBOLA | 8 | UNIT 53 | 08053 | 1999 |
| CIBOLA | 8 | UNIT 61,62 | 08061 | 1999 |
| CIBOLA | 8 | UNIT 64 | 08064 | 1999 |
| CIBOLA | 7 | UNIT 64,68 | 07064 | 1999 |
| CIBOLA | 7 | UNIT 72,78,80,81 | 07072 | 1999 |
| CIBOLA | 8 | UNIT 85 | 08085 | 1999 |
| CIBOLA | 8 | UNIT 89 | 08089 | 1999 |

| | | | | |
|---|---|---|---|---|
| CIBOLA | 7 | UNIT 90 | 07090 | 1999 |
| CIBOLA | 8 | UNIT 90 | 08090 | 1999 |
| COCONINO | 07 | BUCK SPRINGS | 00083 | 1999 |
| COCONINO | 04 | BUCKHORN | 00114 | 1999 |
| CORONADO | D2 | ALTO | 00246 | 1999 |
| CORONADO | D1 | BIG BEND | 00124 | 1999 |
| CORONADO | D4 | BOTTLE CANYON | 00427 | 1999 |
| CORONADO | D4 | COPPER CREEK | 00444 | 1999 |
| CORONADO | D3 | Crittendon | 00314 | 1999 |
| CORONADO | D4 | DEER CREEK | 00429 | 1999 |
| CORONADO | D1 | FOURR | 00153 | 1999 |
| CORONADO | D4 | GILLESPIE | 00417 | 1999 |
| CORONADO | D4 | GRANT CREEK | 00413 | 1999 |
| CORONADO | D1 | GUADALUPE | 00143 | 1999 |
| CORONADO | D3 | O'Donnell | 00332 | 1999 |
| CORONADO | D3 | Papago | 00334 | 1999 |
| CORONADO | D1 | PEDREGOSA | 00125 | 1999 |
| CORONADO | D5 | SAMINAGO RIDGE | 00513 | 1999 |
| CORONADO | D1 | SANDERS | 00145 | 1999 |
| CORONADO | D4 | SO.ASH CREEK | 00436 | 1999 |
| CORONADO | D2 | SQUAW GULCH | 00248 | 1999 |
| CORONADO | D4 | SUNSET | 00431 | 1999 |
| CORONADO | D2 | TEMPORAL | 00250 | 1999 |
| CORONADO | D4 | TEN | 00422 | 1999 |
| GILA | 06 | APACHE CANYON | 601 | 1999 |
| GILA | 06 | BLACK BOB | 602 | 1999 |
| GILA | 03 | CENTERFIRE | 303 | 1999 |
| GILA | 09 | EAST DEMETRIO | 906 | 1999 |
| GILA | 09 | EAST SAND FLAT | 907 | 1999 |
| GILA | 06 | FRISCO PLAZA | 618 | 1999 |
| GILA | 02 | NORTH WAHOO | 214 | 1999 |
| GILA | 04 | RAIN CRK.-74 MT. | 725 | 1999 |
| GILA | 07 | REDSTONE | 714 | 1999 |
| GILA | 04 | ROBERTS PARK | 418 | 1999 |
| GILA | 07 | ROUGH CANYON | 726 | 1999 |
| GILA | 05 | SAPILLO | 509 | 1999 |
| GILA | 02 | V+T | 229 | 1999 |
| KAIBAB | 4 | MOQUI | 36 | 1999 |
| KAIBAB | 1 | TULE | 55 | 1999 |
| LINCOLN | 03 | BEAR SPRINGS | 00301 | 1999 |
| LINCOLN | 02 | CURTIS CANYON | 00406 | 1999 |
| LINCOLN | 02 | DOG CANYON | 00429 | 1999 |
| LINCOLN | 01 | PERRY CANYON | 00520 | 1999 |
| LINCOLN | 02 | PINON | 00438 | 1999 |
| LINCOLN | 02 | SMITH | 00419 | 1999 |
| PRESCOTT | 05 | COPPER CANYON | 00505 | 1999 |
| PRESCOTT | 05 | SQUAW PEAK | 00515 | 1999 |
| PRESCOTT | 05 | YOUNG | 00520 | 1999 |
| SANTA FE | 05 | CAPULIN | 00402 | 1999 |
| SANTA FE | 01 | JAROSA | 00105 | 1999 |
| SANTA FE | 02 | LA JARA | 00206 | 1999 |
| SANTA FE | 02 | OJITOS | 00200 | 1999 |
| SANTA FE | 05 | ROSILLA | 00520 | 1999 |

| | | | | |
|---|---|---|---|---|
| SANTA FE | 03 | SAN DIEGO | 00312 | 1999 |
| SANTA FE | 06 | SIERRA MOSCA | 00801 | 1999 |
| APACHE-SIT. | 6 | BEEHIVE | 00601 | 2000 |
| APACHE-SIT. | 7 | BRUSHY/BUCK SPR. | 00052 | 2000 |
| APACHE-SIT. | 1 | BUSH CREEK | 00208 | 2000 |
| APACHE-SIT. | 1 | FOOTE CREEK | 00207 | 2000 |
| APACHE-SIT. | 5 | HEBER | 00016 | 2000 |
| APACHE-SIT. | 3 | HICKEY | 00312 | 2000 |
| APACHE-SIT. | 7 | PINEDALE | 00031 | 2000 |
| APACHE-SIT. | 3 | PLEASANT VALLEY | 00230 | 2000 |
| CARSON | 7 | ARROYO HONDO | 700 | 2000 |
| CARSON | 2 | COMANCHE | 203 | 2000 |
| CARSON | 4 | FLECHADO | 453 | 2000 |
| CARSON | 1 | MESA OSO | 121 | 2000 |
| CARSON | 4 | OLLA-RANCHOS | 454 | 2000 |
| CARSON | 4 | TIENDITAS | 455 | 2000 |
| CARSON | 6 | TIO GRANDE | 617 | 2000 |
| CIBOLA | 3 | ABBE SPRINGS | 03319 | 2000 |
| CIBOLA | 3 | BEAR MOUNTAIN | 03313 | 2000 |
| CIBOLA | 2 | BLUEWATER | 02225 | 2000 |
| CIBOLA | 4 | CORONA | 04417 | 2000 |
| CIBOLA | 4 | COUGAR MOUN-TAIN | 04416 | 2000 |
| CIBOLA | 2 | MT SEDGEWICK | 02230 | 2000 |
| CIBOLA | 3 | SAWTOOTH | 03327 | 2000 |
| CIBOLA | 7 | UNIT 100,101,141 | 07100 | 2000 |
| CIBOLA | 8 | UNIT 142,143,144 | 08142 | 2000 |
| CIBOLA | 8 | UNIT 3 | 08003 | 2000 |
| CIBOLA | 8 | UNIT 35 | 08035 | 2000 |
| CIBOLA | 7 | UNIT 42 | 07042 | 2000 |
| CIBOLA | 8 | UNIT 46,129-137 | 08046 | 2000 |
| CIBOLA | 7 | UNIT 58,60,61 | 07058 | 2000 |
| CIBOLA | 8 | UNIT 60 | 08060 | 2000 |
| CIBOLA | 8 | UNIT 81 | 08081 | 2000 |
| CIBOLA | 7 | UNIT 97,98,99 | 07097 | 2000 |
| CIBOLA | 2 | WELLS SPRING | 02224 | 2000 |
| COCONINO | 05 | ANDERSON SPRINGS | 00053 | 2000 |
| COCONINO | 07 | BAR T BAR | 00119 | 2000 |
| COCONINO | 02 | BLACK BILL | 00108 | 2000 |
| COCONINO | 05 | LAKE MARY/ FISHER | 00115 | 2000 |
| COCONINO | 07 | LOST EDEN | 00111 | 2000 |
| COCONINO | 02 | PEAKS | 00106 | 2000 |
| CORONADO | D2 | AGUA CALIENTE | 00245 | 2000 |
| CORONADO | D2 | BOX CANYON | 00235 | 2000 |
| CORONADO | D1 | BRUNO | 00120 | 2000 |
| CORONADO | D4 | FOUR MILE | 00425 | 2000 |
| CORONADO | D1 | GERONIMO | 00138 | 2000 |
| CORONADO | D4 | GILLMAN | 00420 | 2000 |
| CORONADO | D1 | GRAVES | 00133 | 2000 |
| CORONADO | D1 | HALFMOON | 00156 | 2000 |

| | | | | |
|---|---|---|---|---|
| CORONADO | D2 | HELVETIA | 00233 | 2000 |
| CORONADO | D3 | Lyle Canyon | 00327 | 2000 |
| CORONADO | D2 | MADERA | 00244 | 2000 |
| CORONADO | D3 | Manilla | 00328 | 2000 |
| CORONADO | D2 | MCBETH | 00239 | 2000 |
| CORONADO | D1 | OUTLAW     MOUN- TAIN | 00135 | 2000 |
| CORONADO | D4 | RILEY PEAK | 00446 | 2000 |
| CORONADO | D4 | ROCK HOUSE | 00445 | 2000 |
| CORONADO | D4 | SAN PEDRO | 00441 | 2000 |
| CORONADO | D3 | Sawtelle | 00339 | 2000 |
| CORONADO | D4 | SEVENTY SIX | 00412 | 2000 |
| CORONADO | D4 | SHINGLE MILL | 00411 | 2000 |
| CORONADO | D1 | SKELETON | 00131 | 2000 |
| CORONADO | D4 | SOMBRERO BUTTE | 00443 | 2000 |
| CORONADO | D4 | SQUAW BASIN | 00426 | 2000 |
| CORONADO | D2 | STONE SPRINGS | 0231 | 2000 |
| CORONADO | D4 | WHITE STREAKS | 00423 | 2000 |
| CORONADO | D2 | WHITEHOUSE | 00243 | 2000 |
| GILA | 02 | BLACK RANGE | 201 | 2000 |
| GILA | 07 | BULLARD PEAK | 701 | 2000 |
| GILA | 07 | BURRO MOUNTAIN | 702 | 2000 |
| GILA | 04 | DEVILS PARK | 427 | 2000 |
| GILA | 04 | HOLT GULCH | 410 | 2000 |
| GILA | 06 | LEGGETT | 619 | 2000 |
| GILA | 05 | POWDERHORN | 508 | 2000 |
| GILA | 02 | SILVER CREEK | 216 | 2000 |
| GILA | 06 | T BAR | 623 | 2000 |
| GILA | 09 | WEST DEMETRIO | 910 | 2000 |
| KAIBAB | 2 | GOVERNMENT MTN | 10 | 2000 |
| KAIBAB | 3 | HOUSEROCK | 27 | 2000 |
| KAIBAB | 3 | KANE | 28 | 2000 |
| LINCOLN | 02 | AKERS | 00445 | 2000 |
| LINCOLN | 01 | ARROYO SECO | 00102 | 2000 |
| LINCOLN | 01 | BENADO GAP | 00105 | 2000 |
| LINCOLN | 02 | EK- N BLUEWATER | 00431 | 2000 |
| LINCOLN | 03 | HARDIN | 00308 | 2000 |
| LINCOLN | 02 | RUSSIA CANYON | 00216 | 2000 |
| LINCOLN | 02 | UPPER BURNT | 00424 | 2000 |
| PRESCOTT | 03 | BUCKHORN | 00303 | 2000 |
| PRESCOTT | 03 | BURNT RANCH | 00304 | 2000 |
| PRESCOTT | 03 | COLD SPRINGS | 00305 | 2000 |
| PRESCOTT | 01 | SMITH CANYON | 00120 | 2000 |
| PRESCOTT | 05 | SYCAMORE | 00516 | 2000 |
| PRESCOTT | 03 | TANK CREEK | 00312 | 2000 |
| SANTA FE | 06 | EROSION | 00807 | 2000 |
| SANTA FE | 02 | GALLINA MTN. | 00204 | 2000 |
| SANTA FE | 01 | GALLINA RIVER | 00104 | 2000 |
| SANTA FE | 02 | PENAS NEGRAS | 00209 | 2000 |
| SANTA FE | 05 | RIO DE LA CASA | 00407 | 2000 |
| SANTA FE | 05 | SAN JOSE | 00409 | 2000 |

| | | | | |
|---|---|---|---|---|
| SANTA FE | 03 | SAN JUAN WATER | 00316 | 2000 |
| SANTA FE | 03 | VALLECITOS | 00309 | 2000 |
| APACHE-SIT. | 7 | BLUE RIDGE | 00045 | 2001 |
| APACHE-SIT. | 6 | CROSS BAR | 00606 | 2001 |
| APACHE-SIT. | 4 | LIMESTONE | 00007 | 2001 |
| APACHE-SIT. | 3 | PIGEON | 00319 | 2001 |
| APACHE-SIT. | 6 | RUDD KNOLL | 00618 | 2001 |
| APACHE-SIT. | 1 | UTH ESCUDILLA | 01210 | 2001 |
| APACHE-SIT. | 7 | TOWN TANK | 00035 | 2001 |
| APACHE-SIT. | 3 | TULE | 00324 | 2001 |
| APACHE-SIT. | 1 | WILLIAMS VALLEY | 00131 | 2001 |
| CARSON | 2 | JAROSITA | 210 | 2001 |
| CARSON | 4 | RIO CHIQUITO | 402 | 2001 |
| CARSON | 7 | SAWMILL PARK | 710 | 2001 |
| CARSON | 6 | SERVILLETA | 633 | 2001 |
| CARSON | 6 | TRES OREJAS | 637 | 2001 |
| CARSON | 3 | VALENCIA | 350 | 2001 |
| CIBOLA | 4 | BARRANCA | 04403 | 2001 |
| CIBOLA | 2 | BRENNAN | 02217 | 2001 |
| CIBOLA | 2 | CROWDER LOW | 02233 | 2001 |
| CIBOLA | 2 | CROWDER REID | 02236 | 2001 |
| CIBOLA | 3 | GAP | 03300 | 2001 |
| CIBOLA | 3 | NORTH CANYON | 03341 | 2001 |
| CIBOLA | 7 | UNIT 103,146 | 07103 | 2001 |
| CIBOLA | 8 | UNIT 118 | 08118 | 2001 |
| CIBOLA | 7 | UNIT 23 | 07023 | 2001 |
| CIBOLA | 7 | UNIT 27,32 | 07027 | 2001 |
| CIBOLA | 8 | UNIT 75 | 08075 | 2001 |
| CIBOLA | 7 | UNIT 84,136 | 07084 | 2001 |
| CIBOLA | 8 | UNIT 97, 98 | 08097 | 2001 |
| COCONINO | 02 | ANGELL | 00104 | 2001 |
| COCONINO | 02 | COSNINO | 00021 | 2001 |
| COCONINO | 01 | FOSSIL CREEK | 00006 | 2001 |
| COCONINO | 05 | WALNUT CANYON | 00066 | 2001 |
| CORONADO | D5 | AGUA VERDE | 00522 | 2001 |
| CORONADO | D2 | ALAMO | 00217 | 2001 |
| CORONADO | D3 | Alisos | 00353 | 2001 |
| CORONADO | D4 | BASS CANYON | 00438 | 2001 |
| CORONADO | D4 | BAYLESS | 00440 | 2001 |
| CORONADO | D3 | Benson | 00303 | 2001 |
| CORONADO | D4 | BONITA | 00424 | 2001 |
| CORONADO | D2 | CALABASAS | 00216 | 2001 |
| CORONADO | D3 | Campini | 00309 | 2001 |
| CORONADO | D1 | CLANTON/CLOVER | 00137 | 2001 |
| CORONADO | D3 | Duquesne | 00342 | 2001 |
| CORONADO | D4 | FOSTER | 00406 | 2001 |
| CORONADO | D5 | HAPPY VALLEY | 00518 | 2001 |
| CORONADO | D4 | HAWK HOLLOW | 00414 | 2001 |
| CORONADO | D3 | Hayfield | 00345 | 2001 |
| CORONADO | D4 | KANE SPRINGS | 00405 | 2001 |
| CORONADO | D3 | Knear | 00302 | 2001 |
| CORONADO | D3 | Lone Mountain | 00326 | 2001 |
| CORONADO | D2 | MARIPOSA | 00219 | 2001 |

| | | | | |
|---|---|---|---|---|
| CORONADO | D2 | MARSTELLAR | 00218 | 2001 |
| CORONADO | D3 | Mescal | 00318 | 2001 |
| CORONADO | D3 | Middle Canyon | 00306 | 2001 |
| CORONADO | D2 | MURPHY | 00212 | 2001 |
| CORONADO | D2 | PENA BLANCA | 00215 | 2001 |
| CORONADO | D1 | PINERY | 00162 | 2001 |
| CORONADO | D1 | PRICE CANYON | 00117 | 2001 |
| CORONADO | D2 | RAMANOTE | 00214 | 2001 |
| CORONADO | D5 | RINCON | 00524 | 2001 |
| CORONADO | D2 | ROCK CORRAL | 00211 | 2001 |
| CORONADO | D5 | ROCK PILE | 00523 | 2001 |
| CORONADO | D1 | ROUGH    MOUN-TAIN | 00146 | 2001 |
| CORONADO | D3 | San Rafael | 00338 | 2001 |
| CORONADO | D3 | Sierra Tordillo | 00341 | 2001 |
| CORONADO | D2 | SOPORI | 00210 | 2001 |
| CORONADO | D4 | STOCKTON PASS | 00418 | 2001 |
| CORONADO | D3 | U-D | 00347 | 2001 |
| CORONADO | D4 | VEACH | 00416 | 2001 |
| CORONADO | D4 | WEAR | 00437 | 2001 |
| GILA | 07 | C-BAR | 703 | 2001 |
| GILA | 06 | DEADMAN | 606 | 2001 |
| GILA | 06 | EAGLE PEAK | 608 | 2001 |
| GILA | 07 | HOO DOO | 710 | 2001 |
| GILA | 09 | JEWETT GAP | 914 | 2001 |
| GILA | 04 | KELLY | 428 | 2001 |
| GILA | 04 | PINE CIENEGA | 415 | 2001 |
| GILA | 05 | SHEPPARD | 510 | 2001 |
| GILA | 07 | TWIN SISTERS | 718 | 2001 |
| GILA | 07 | WHITE SIGNAL | 721 | 2001 |
| KAIBAB | 2 | DAVENPORT LK | 6 | 2001 |
| KAIBAB | 2 | HOMESTEAD | 11 | 2001 |
| KAIBAB | 4 | RAIN TANK | 38 | 2001 |
| LINCOLN | 02 | AGUA CHIQUITA | 00411 | 2001 |
| LINCOLN | 02 | BEAR CREEK | 00400 | 2001 |
| LINCOLN | 01 | EAST HALE LAKE | 00508 | 2001 |
| LINCOLN | 01 | FINLEY | 00510 | 2001 |
| LINCOLN | 01 | KUDNER | 00119 | 2001 |
| LINCOLN | 02 | LEWIS | 00412 | 2001 |
| LINCOLN | 03 | MCCOLLAUM | 00311 | 2001 |
| LINCOLN | 01 | SALAZAR | 00128 | 2001 |
| LINCOLN | 01 | VERA CRUZ | 00132 | 2001 |
| LINCOLN | 01 | WELCH | 00134 | 2001 |
| PRESCOTT | 05 | BOTTLE | 00502 | 2001 |
| PRESCOTT | 05 | GOAT PEAK | 00508 | 2001 |
| PRESCOTT | 01 | HITT WASH | 00117 | 2001 |
| PRESCOTT | 01 | JORDAN PASTURE | 00118 | 2001 |
| PRESCOTT | 01 | K4 | 00114 | 2001 |
| PRESCOTT | 01 | WALNUT CREEK | 00122 | 2001 |
| PRESCOTT | 01 | WILLIAMSON VLY | 00123 | 2001 |
| SANTA FE | 03 | BEAR SPRINGS | 00318 | 2001 |
| SANTA FE | 02 | CHIQUITO | 00218 | 2001 |
| SANTA FE | 05 | COW CREEK | 00508 | 2001 |

| | | | | |
|---|---|---|---|---|
| SANTA FE | 06 | LA CAJA DEL RIO | 00606 | 2001 |
| SANTA FE | 01 | LA PRESA | 00106 | 2001 |
| SANTA FE | 01 | LOS INDIOS | 00111 | 2001 |
| SANTA FE | 05 | OSHA | 00516 | 2001 |
| SANTA FE | 03 | PERALTA | 00322 | 2001 |
| SANTA FE | 05 | SOLDIER CREEK | 00523 | 2001 |
| SANTA FE | 05 | VALLE MEDIO | 00525 | 2001 |